No. 15,423.

RINNANDER ET AL. *v.* DENVER MILK PRODUCERS, INC.
(166 P. [2d] 984)

Decided March 4, 1946.

Mr. GLENN L. DALY, for plaintiffs in error.

Mr. RICHARD H. SIMON, Mr. ROBERT B. LEE, for defendant in error.

*En Banc.*

MR. JUSTICE BAKKE delivered the opinion of the court.

THIS is an action brought by the Denver Milk Producers, Inc., a co-operative marketing association, to which we hereinafter refer as the association, for injunctive relief and damages against Albert Rinnander and Joseph Floyd, doing business as the Mountain View Creamery, for allegedly inducing, or attempting to induce, one John Wojtacha to break his contract with the association. At the trial it developed that Floyd had no interest in the Mountain View Creamery, and the court dismissed both causes of action as to him, but held in favor of the association and against Rinnander on the issues of injunctive relief and damages and entered judgment against him for $500 as liquidated damages under the statute. He seeks reversal on a writ of error, and will be designated herein as defendant.

The action was brought under section 41, chapter 106, '35 C.S.A., which reads, as follows: "Any person or persons or any corporation whose officers * * * knowingly induce or attempt to induce any member or stockholder of an association organized hereunder * * * to break his marketing contract with the association * * * shall be guilty of a misdemeanor * * * and shall be liable to the association * * * in a civil suit in the penal sum of five hundred dollars ($500) for each such offense."

The facts are substantially as follows: John Wojtacha, his wife, son Alex and two daughters, had been making their home on a twenty-acre tract in the Arvada community, where they kept a dairy herd of about fifty head and sold milk. On May 8, 1942, two representatives of the association stopped at the farm and interviewed John Wojtacha about joining the association. There is dispute as to what was said at the time, but he did sign a membership agreement. There is no suggestion that he was imposed upon, or that any misrepresentations were made to him regarding the contract, or that he did not sign it voluntarily. On August 26, 1942, the association sent John Wojtacha his membership card, a copy of the by-laws and articles of incorporation of the association, together with a letter telling him that he must sell his milk to one of a list of thirty dairies, one of which was the Wheatridge Dairy, and thereafter he did sell his milk to that dairy in accordance with his contract.

Meanwhile, on July 30, 1942, the association sent to defendant by registered mail with request for return receipt, a letter in which was inclosed a list of the members of the association, one of whom was John Wojtacha. The letter contained the statement: "We are sure you have no desire to interfere with the operation of this organization or to violate the Act under which the organization was incorporated and for that reason this information is given you hereto." Quoted in the letter was section 28 of the 1923 Act ('35 C.S.A., c. 106, §41,

supra). Defendant admits the receipt of the letter and inclosures (Exhibits C & D).

About September 21, 1942, defendant, while out driving and looking for milk producers, called at the Wojtacha farm. He testified that he asked John Wojtacha if he was a member of the association and that John replied: "They got my name, but I did not sign anything; I don't have anything to do with the milk. You will have to come back and see the boy." The next day John was taken to the hospital. Also, on the 22nd of September, defendant called on Alex, the son. Alex testified that defendant "told me if we were dissatisfied where we were shipping, and I told him I did plan on changing shipping, * * * and — I asked Mr. Rinnander if he needed milk and he said yes, he did, so I started shipping to Mr. Rinnander." Defendant admits offering Alex two cents a pound more for his milk than he was getting from the association. Alex admitted that defendant asked him if he or his father were in the association and admitted that he saw his father's membership card: Yet he testified: "I told Mr. Rinnander that we weren't in the association."

Thereafter, two representatives of the association called on the father at the hospital for the purpose of showing him the contract. The father acknowledged that the signature thereon was his, and the representatives called on the son at the home, who admitted that it was his father's signature.

October 3, 1942, the complaint was filed in this action. October 28, 1942, the father executed a bill of sale to the son for the dairy herd, a part of which reads as follows: "That this bill of sale is made in conformance with my verbal understanding made on September 10, 1942, that as of that date Alex J. Wojtacha should be from that time the owner of said cattle." The note given in payment for the cattle remained in the possession of Alex, but the photostatic copy shows endorsement of several payments thereon, in accordance with its terms.

About the same time, a mortgage on the cattle of $1,500 to the Arvada bank was paid, but as to who made the payment the evidence is in conflict.

The defendant testified that he did not know that John Wojtacha was a member of the association until he, defendant, was served with the summons in this case.

The trial court in his "memorandum" findings, said he had given considerable thought to defendant's principal contention that he did not act "knowingly," but stated: "The answer to that contention seems to be that if he did not actually know, he had every means of knowing and every opportunity to know, and the court believes that that is sufficient." The court also stated that if "it had it within its power, it would reduce the amount of that judgment * * *; and if the attorney for the defendant believes that there is any theory upon which the court could enter a judgment for less than $500, the court would entertain an application for the purpose of considering that question before signing the final judgment." No such application was filed.

While defendant argues his specification of points under eight propositions, we think it necessary to consider only three of them: 1. Failure of the evidence to show that defendant acted "knowingly." 2. Failure of the evidence to show that defendant induced, or attempted to induce, a breach of the contract. 3. The transaction wherein defendant is charged with violating the statute was with a person who was not a member of the association, not bound by any contract, and who owned the cattle in his own right.

■ ■ 1. To request us to hold that defendant did not act "knowingly," as that word is used in the statute involved, under the disclosed circumstances, would be unreasonable. Even assuming the truth of defendant's statement that he did not know that John Wojtacha was a member of the association until he received the summons in this case, his admissions disclose facts upon

which it would be fair to say that he did know. His counsel seems to be of the opinion that because both the Wojtachas told him that they were not members of the association, there is no conflict in the evidence. He seems to disregard the documentary evidence which defendant admits receiving by registered mail. In addition, when John Wojtacha told Rinnander that the association had his name, Rinnander had actual knowledge of a fact that should have stopped him from further action. That there was at least a conflict in the evidence from which the trial court could probably reach its conclusion appears beyond question. Further, we think the argument of defendant's counsel that this is a penal statute and as such must be strictly construed, is not controlling. In the case of *Fort v. Co-operative Farmers' Exchange,* 81 Colo. 431, 256 Pac. 319, it was contended "that this section [chapter 106, section 41, supra] makes of the acts described a penal offense, a legal wrong, and that cannot be unless at least the act was accompanied by malice." In response to that contention, we said in part: "Whether or not such unlawful acts are criminal is not a question here. This is a civil, not a criminal, action [citing cases]." Further it will be noted that section 5, chapter 159, '35 C.S.A. provides: "All general provisions, terms, phrases and expressions, used in any statute, shall be liberally construed, in order that the true intent and meaning of the general assembly may be fully carried out." The intent of the general assembly to protect these co-operative marketing associations against interference is so clear and emphatic that there can be no doubt that this section 41, supra, was intended to cover just such situations as are disclosed by the facts in this case. "The rule of strict construction is relaxed in the interpretation of an act designed to declare and enforce a principle of public policy, and a penal statute enacted for the benefit of the public generally should receive a fair and reasonable construction." 59 C.J. 1119. See, also, 25 R.C.L. 1085, 1086. This principle

is particularly applicable in the light of the declared legislative purpose as found in section 14, chapter 106, '35 C.S.A. If we were to adopt the subjective meaning of the word "knowingly" it would be necessary to delve into the thoughts of a man and prove that he had actual knowledge, which would be placing an unreasonable restraint upon the enforcement of the act. We think the trial court was justified in its conclusion on the matter.

2. Defendant admits that he offered Alex two cents a pound more for milk than he was receiving from defendant in error. This procedure is a favorite means of attack upon an association to induce a member to violate his covenant to deliver. Evans and Stokdyk, Law of Co-operative Marketing, p. 133. Alex testified that immediately after receiving the offer of more money for milk, he began delivering to defendant's dairy. We think that under the disclosed circumstances the inducement to the son was equivalent to an inducement to the father. This appears from their statements on the witness stand, where both frequently used the pronoun "we" in connection with the operation of their dairy, both before and after the attempted transfer.

3. The argument of counsel for defendant that Alex was not a member of the association does not impress us as being sound. The trial court was fully justified in finding that the transfer of the dairy stock by the father to the son was a sham and not made in good faith. There was no change in possession as required by section 14, chapter 71, '35 C.S.A., and the situation is no different than that which obtained in *Dairy Co-operative Association v. Brandes Creamery*, 147 Ore. 488, 30 P. (2d) 338, where the court in its opinion said: "This is a case where an attempted evasion of a contractual duty by the formation of a new corporation, new (but not materially different) in name only, is interposed as a defense in equity where injunctive relief is sought against a continuing breach of said duty," and refused to recognize the attempted transfer. As between father

and son here, the General Assembly has taken away the right of either to show that the father did not have control of the dairy herd. Paragraph (c), section 32, chapter 106, '35 C.S.A. *Monte Vista Potato Grower's Ass'n v. Bond,* 80 Colo. 516, 252 Pac. 813. While this statute would not necessarily be controlling against defendant here, the court had a right to consider it in the relationship sought to be established by the Wojtachas.

We are not overlooking the other assignments of error, but are satisfied that they are without merit, or their consideration is unnecessary to the disposition of the case.

The judgment is affirmed.