CAROLINA MILK PRODUCERS ASSOCIATION CO-OPERATIVE, INC. v.
MELVILLE DAIRY, INC.

(Filed 16 June, 1961.)

**1. Agriculture § 16: Contracts § 13½—**

The fact that a milk processor, pursuant to directions of its producer and the terms of a certified copy of the membership agreement between the producer and his marketing association, deducts membership dues from payment for milk purchased directly from the producer and remits such dues to the association, does not make the processor a party to the contract between the producer and his association, and the deduction of such dues, in the absence of legal obligation, remains a matter of courtesy on the part of the processor.

**2. Agriculture § 16: Contracts § 31— Evidence held insufficient to show that processor induced producers to breach their contract with marketing association.**

The evidence disclosed that a milk processor notified its producers of a proposed increase in hauling charges to take effect simultaneously with an increase allowed by the Milk Commission in the wholesale price of milk, that the producers and their marketing association objected to the increase, and the association initiated plans to haul the milk itself, which plan entailed the purchase by each producer of refrigerating equipment, and that the processor thereafter rescinded the increase upon agreement that the producers should improve the side roads into their points of delivery. The evidence further tended to show that many of the producers thereafter became dissatisfied with the association be-

cause of its plan entailing the purchase of additional equipment, and that they verbally notified the processor to cease deducting dues from their checks, and that the processor, after advice from the Milk Commission to obtain written authority before ceasing to deduct membership dues, sent to each producer a blank form for this purpose, which each producer was to execute if he so elected. The producers who testified stated that they terminated their membership because of their dissatisfaction with the association over its plan to haul the milk. *Held:* The evidence is insufficient to show that the processor wrongfully induced or attempted to induce any member to breach his marketing contract with the association. G.S. 54-157.

**3. Penalties—**

Statutes imposing a penalty are to be strictly construed and a party suing to recover a penalty under a statute must bring himself clearly within its purview.

**4. Agriculture § 16—**

Where a milk processor, purchasing directly from producers, deducts dues from its payments for milk so purchased and remits such dues to the producers' marketing association, but discontinues making such deductions pursuant to written instructions of the producers, and thereafter pays the producers in full for the milk purchased, the processor may not be held liable by the association for the dues of such producers, the processor not being a party to the contract between the association and its members and not being liable for the dues after it had paid the producers in full for the milk purchased from them.

**5. Appeal and Error § 49—**

While the findings of fact of the trial court are conclusive on appeal when supported by any substantial evidence, the trial court's inferences of fact which are not based upon direct evidence but upon other inferences, are not conclusive, and its conclusions which involve legal questions are subject to review.

**6. Fraud § 11—**

When the facts admitted or proved are consistent with good faith and honest intent, they should be so construed, since fraud is not presumed.

APPEAL by defendant from *Preyer, J.,* May 2, 1960, Civil Term, GUILFORD Superior Court — Greensboro Division.

Carolina Milk Producers Association Co-operative, Inc., hereafter called the Association, alleged two causes of action against Melville Dairy, Inc., hereafter called Melville. By its first cause of action the Association seeks to recover $42,500 penalties upon the ground Melville knowingly attempted to induce members of the Association to breach their membership and marketing agreements. By its second cause of action, the Association seeks to recover $84,360.96, total value of all milk sold and delivered to Melville by the members of the Association for the months of March, April, May, and June, 1958.

The defendant filed a demurrer to the complaint upon the ground it failed to allege a cause of action in either particular. The court entered an order overruling the demurrer and allowing the defendant time to answer. In answer to the first cause of action the defendant denied it had induced or attempted to induce any member to breach his contract with the Association. In answer to the second cause of action the defendant denied it had entered into any contract with or had purchased any milk from the Association or that it was due the plaintiff anything on any account. The parties waived jury trial and consented that the judge should try the case.

The plaintiff Association was incorporated in 1952 with its principal office in Greensboro. It was to act as a co-operative for dairy farmers in "the Piedmont and Southeastern part of the State." Farmers who produced raw milk for sale to processors were admitted to membership in the Association by signing a marketing contract. The membership contract A contained, among others, the following provisions:

"The undersigned milk producer, hereinafter called the Member, and the undersigned co-operative, hereinafter called the Association, in consideration of their mutual promises, agree as follows:

"1. The Member hereby appoints the Association his agent for the purpose of marketing, either directly or through its authorized representative, all of the milk produced by the Member, except such as he retains for family use, during the period set out in paragraph 2 hereof; and the Member agrees that during that period he will ( )liver to the Association or its nominees, at such place or places ᴜs the Association or its authorized representative, may direct, all such milk so produced by him.

"2. This agreement shall be effective for a period of one (1) year from the date hereof and thereafter for successive periods of one year therefrom subject, however, to the following provisions: Either the Member or the Association may terminate this contract on any yearly anniversary date hereof after the first by written notice of such termination given not more than forty-five (45) days and not less than thirty (30) days before such anniversary date.

"4. ... A copy of this agreement certified to by an authorized agent of the Association shall constitute authority and direction to any dealer to whom such milk is sold to pay therefor directly to the Association or otherwise as the Association may from time to time direct.

"7. The Association or its authorized representative will market

milk delivered to it by the Member, together with milk delivered to it by other members of the Association, at such price or prices as it may deem to be most advantageous, and, after making such deductions as are authorized by this contract, will pay to, or cause to be paid to, the Member his proportion of the total receipts therefor.

"8. (a) The Association shall make deductions from the proceeds of the sale of milk delivered by the Member as follows: (1) All costs and expenses of the Association in marketing the milk and the fair part of the general operating costs and expenses of the Association, including valuation or operating reserves, interest on capital of not to exceed six per cent per annum, and twenty-five cents ($.25) each year for the official publication of the Association; and (2) Such amounts at regular intervals as the board of directors may deem necessary or advisable for the purpose of providing adequate capital and capital reserves and for the purpose of revolving such capital.

"10. The Member agrees that, in the event of any breach or threatened breach by him of this contract, the Association shall be entitled to an injunction to prevent the further breach of this contract and to a decree of specific performance hereof.

"11. If the Association shall adopt a revised marketing contract for execution by other members differing in terms from those contained herein, such revised contract shall not invalidate this contract, but the undersigned Member shall have the privilege of executing such revised contract and of substituting it for this contract."

Thirty-seven producers signed contract A. Copies of this contract were certified by the Association to Melville with a request that six cents (6¢) per hundredweight of milk delivered be deducted from each producer's check and transmitted to the Association.

Beginning with payments for the month of December, 1953, and continuing through November, 1957, Melville deducted dues from all members and transmitted them to the Association. On October 24, 1954, Mr. Lytle, Manager of the Association, wrote to Mr. Scott, President and Manager of Melville, "We certainly appreciate your 'cooperation in making the dues deductions for members of this Association upon the authorization and request of the Association. As you know, some of the companies refuse to make deductions without some additional authority."

The Association changed the substance of the membership agreement by contract B, giving the Association a larger measure of con-

trol over the marketing of milk products by the members. However, only five members signed, three of whom were under contract A, and two new members. To the agreement was attached a notation for the member to sign, authorizing Melville to remit dues to the Association. The new marketing agreement (B) did not change Melville's legal position either with the producers or with the Association.

Effective September 16, 1957, the North Carolina Milk Commission ordered into effect a thirty cents per hundredweight increase in price of Class One Milk. The Association opposed the increase. On September 17, 1957, the defendant wrote the following letter to each producer:

"As you know, effective September 16th the price of Class One Milk advances 30¢ per hundred. On the same date we are advancing the hauling charges 10¢ per hundred. The Milk Commission is allowing 15 cents per hundred for the whole month of September rather than for us to have to figure two payrolls. We will calculate the hauling on the same basis—that is it will show as 5 cents per hundred for all of September. Our business is continuing to show improvement but our production is gaining also. I might say that we are not planning to go to bulk tanks at present and you will have plenty of notice in advance before we make any changes. I do hope you will have plenty of refrigeration for your milk. That is most important. Any time you are in town, I would like for you to stop by and see me and discuss the progress we are making and also some of the problems we are having."

After the receipt of the foregoing letter, a committee of producers conferred with the defendant with respect to increasing the hauling charge. In the meantime, the Association reported the proposed increase to the North Carolina Milk Commission which conducted a hearing but made no order in the case. Melville contended the expenses of hauling had increased. Many of the side roads were in bad repair. The increased operating expense and truck upkeep justified a ten-cent hauling increase. After another meeting some of the producers offered to improve the side roads and drives into their points of delivery. Mr. Scott, for the defendant, promised to re-examine his hauling costs and arrange for further conference.

As an aftermath of the defendant's proposal to increase the hauling charges, the Association sought to have the producers install refrigeration so that the Association, by the purchase of tank trucks, could take over all the hauling. Many of the producers objected to the transfer to tank operation since this would require each producer to make an outlay of from $1,800 to $2,300 for the change over. After the defendant made a re-examination of its hauling costs and the producers

had promised to improve their roads and drives, Melville canceled the proposed increase. The plan of the Association to go to tank trucks did not meet with the approval of the defendant nor many of the producers. The Melville Dairy had its hauling equipment. It had purchased hauling routes from a former transporter. Its contact with the producers was direct and established and maintained good will and assured it a steady and reliable milk supply. The producers did not like the initial investment incident to the transfer to tanks. The result was dissatisfaction not only between the producers who were customers of the defendant, but between other processors and their customers. Producers began to notify the defendant they were no longer willing for the defendant to deduct dues. In fact, Southern Dairies, which operated in the same territory, never did make any dues deduction, though many of its producers were members of the plaintiff Association.

On account of the complaints from producers over the deduction of dues, Mr. Whitaker, Executive Secretary of the North Carolina Milk Commission, took notice of the situation. On October 3, 1957, he sent to the plaintiff Association a proposed order of the Milk Commission, stating in part:

"The State Milk Commission has been informed recently by several distributors that they have received written notice from certain producers to discontinue deductions which have been previously made each month. . . . The Association having filed with the distributor a certified copy of the contract with each producer. The distributors seek advice as to what procedure should be followed in such cases."

(There followed a full quotation of G.S. 106-266.12.) The Association objected to the proposal and asked to be heard before its adoption. Nothing thereafter seems to have been done by the Commission. Mr. Whitaker, however, testified as a witness: "I said to Mr. Scott as I have to many other distributors in North Carolina that he should make the dues deduction, or rather that he should have something in writing from the producers before he stopped making these deductions."

Thereafter, defendant sent the following to its producers: "We have had numerous requests to discontinue taking out dues for the Carolina Milk Producers Association. If you want this done please sign below and either drop it in the mail or give it to your hauler to give us. Sincerely, Melville Dairy, Inc., Ralph H. Scott." Attached to the above was the following: "December 1957. TO MELVILLE DAIRY, INC.: PLEASE DISCONTINUE DEDUCTING THE 6¢ PER HUN-

DRED POUNDS OF MILK FROM MY CHECK FOR THE CARO-
LINA MILK PRODUCERS ASSOC. AS OF DEC. 1, 1957, Signed
————————————. Can No. ——————————.''

On December 30, 1957, the defendant received from the attorney
for the Association a letter of which the following is a part:

> "Mr. R. G. Lytle has furnished me a form letter from you to
> your producers which was delivered a few days ago at the farm
> of one of your producers who is also a member of the Association.
> Mr. Lytle told me also that he had been informed that a similar
> letter was delivered at the farm of each of the other members of
> the Association whose milk is sold to you. I am enclosing here-
> with a copy of the form letter referred to.
>
> "I am of the opinion that the distribution of this letter to mem-
> bers of the Association whose milk is sold to you constitutes an
> attempt to induce such members of the Association, to breach
> their marketing contracts with the Association, and that that is
> a matter for which the court will furnish adequate civil relief.
> In this connection I call your attention to Sec. 54-157 of the North
> Carolina General Statutes which provides for a $500.00 penalty
> to be recovered in a civil action by an Association in any case
> where a member is induced to breach his marketing contract with
> the Association.
>
> "I am of the opinion that the Association has valid marketing
> contracts with the members hereinbefore referred to, and the
> purpose of this letter is to request you to do either one of two
> things:
>
> "(1) Remit to the Association at the proper times the amount
> of the deductions authorized by these members, or
>
> "(2) Remit to the Association all of the money which may be-
> come due to such members for their milk sold and delivered to you.
>
> "In connection with the latter, I call attention to the provision
> of the marketing contracts which provides that the Association
> has full power and authority —
>
> "'(e) To collect in its own name all or any part of the money
> which may become due to the member (1) for milk sold by the
> Association for the member—'
>
> "If the full purchase price of the milk is remitted to the As-
> sociation, the Association will, of course, make the proper deduc-
> tions therefrom and will remit the balance directly to the mem-
> bers."

On April 14, 1958, at the All-Jersey Meeting of Milk Producers in
Graham, at which 50 to 100 producers were present, including many of

Melville's suppliers of milk, Mr. Scott, at the end of the meeting, made a statement: "He told the Carolina Milk Producers Association members . . . that there was a controversy about the dues deductions and that he had been authorized to send the money to the office, . . . and he wanted an authorization from each individual, that he was in the middle, that somebody could be sued and he didn't want one of his producers suing him for not sending the money to them . . . and for all who wanted their milk check money . . . submitted to the producers' Association office, that he wished they would sign . . . to that effect." As a result of the April 14th meeting, only three members of the Association, and one of these was a director, signified their willingness by written request to have the defendant send their milk checks to the Association.

In the trial the plaintiff called as witnesses most of the 37 members and former members of the Association who identified their membership contracts which Mr. Lytle had certified to the defendant. Not one, however, testified to any act or deed on the part of the defendant or any of its agents which caused or tended to cause any member to breach his membership and marketing contract with the Association. There was in fact no evidence of a breach by any producer.

Mr Scott, the present President and Manager of the defendant, testified in substance that he began operating the defendant in 1927 as an individually owned business, changed to co-partnership in 1934, and incorporated in October, 1953. "We have always done the hauling of milk for the producer to our plant. We bought the routes — from those who did the hauling and made arrangements with the producers to do the hauling ourselves. We bought their trucks and their routes also. When we received the November 25, 1953, letter with enclosures (membership contracts) we checked with them and then passed them on to our bookkeeping department and they made the deductions." The defendant as a courtsey to the plaintiff deducted dues until producers began to complain. Its President, Mr. Scott, contacted the Milk Commission and was advised to get something in writing from the producers and for this purpose he sent the memo dated December, 1957. Later, at the April 14th meeting in Graham, he distributed slips so that the producers might indicate their wishes with respect to payments for milk. Only three producers authorized payment to the Association. These payments were made as authorized. Mr. Scott further testified neither he nor any agent of the defendant, to his knowledge, influenced or attempted to influence any producer to breach his marketing agreement with the Association.

D. Grady Perry testified: "I have been selling milk to Melville Dairy ten or twelve years. . . . I became a member of the Carolina

Milk Producers Association. There was not any difference in the procedure I followed after I became a member of the Association . . . I terminated my membership in June of 1958. . . . I went up to the Association office to get my release, and I asked Mr. Lytle if I was supposed to pay up my dues and he said, no, he'd get it out of Ralph Scott . . . I did speak to Mr. Scott to stop taking out my dues. At that time I told Mr. Scott I wanted to discontinue taking out my dues for the reason that I hadn't received any benefit whatsoever from the Association, and I felt like they were taking my money and not giving me anything in return."

Ralph Woody testified: "Some time during 1953 I was informed by Mr. Scott that the Association had asked him to take my dues out. I did not make any objection to it at that time. I think I first registered an objection with Melville Dairy about taking out my dues when the tank subject probably came up and I wasn't financially able to go into it at that time if I could wait a while longer. . . . As to what led up to the decision on my part to notify Melville to discontinue paying my dues — the Producers Association wanted us to go to tank and I felt like we couldn't go right then. . . . I received and read a copy of the letter dated October 12, 1957 . . . I did not consider what was said in here in arriving at my decision to discontinue the payment of my dues. . . . I just wasn't ready to go to tanks and I felt like probably the distributor in it is the one to do the hauling and the one to have the final say-so. . . . I know for certain I signed a dues discontinuance form. . . . As to the question of whether I ever offered to pay my dues up to the time my membership terminated, . . . I told Mr. Lytle . . . that after my contract expired I wasn't going to pay any dues any more and he said it didn't make a damn to him whether I paid them or not. He said, 'I am going to collect them out of Ralph Scott.' "

J. F. Huey testified: "I had been selling milk to Melville Dairy for about 12 years . . . I thought I was going to benefit by it (membership in the Association) and that is the reason I signed it. . . . The early part of 1958 I went to Melville Dairy and told them not to take out my dues. My reason . . . was that we had a meeting at Mr. Hargrove's (a director of the Association) and all that they talked about was going to bulk tank and I wasn't financially able . . . That was my reason for cancelling. Neither Mr. Scott nor anyone representing Melville Dairy had anything to do with my decision to cancel with the organization."

Charles Shore testified: "I have been selling to Melville since 1939 . . . I signed the contract. . . . In the Fall of 1957, I received this document (vote to discontinue dues deductions). I was not induced

to sign this by anyone. I made up my mind myself to sign it. . . . Prior to the time I signed this document I had a conversation with Mr. Scott, the President of Melville Dairy . . . I went to his office one day and asked him to discontinue taking my dues out. That was before I signed this document, . . . I received in the mail from Melville Dairy some time in October the ballot . . . my wishes on hauling. I voted 'I do not want to install a milk tank.' "

G. A. Payne testified: "The decision to tell Mr. Scott not to take out any milk dues was my own decision. I made up my mind about that myself. He said, 'If that is what you ask us to do, I'll do it.' I said, 'That is what I want you to do.' "

The defendant tendered seven witnesses to corroborate Ralph Woody. None was cross-examined. "It was ascertained that all seven attended the April 14, 1958 All-Jersey meeting; also that none of them at the time of the trial were (sic) members of the Association." Brief reference will be made in the opinion to other evidence offered.

At the conclusion of the testimony, the trial judge found, among other things, the following: (1) The plaintiff is a co-operative marketing association made up of milk producers. (2) The defendant is a corporation operating a milk processing plant. (3) During the period from September, 1957, through June, 1958, thirty-four farmers who were under contract A to the Association sold and delivered milk to the defendant. Five dairy farmers who were by contract B members of the Association sold milk to the defendant. Of these, three were also included in the 34 because of their execution of both contracts. (4) Certified copies of contract A have been delivered by the Association to the defendant. (5) The marketing contracts were valid and binding between the Association and the members. In addition to the above, the court made these findings which are quoted in full:

"(9) Prior to December, 1957, the defendant had continuously recognized the validity of the aforesaid contracts and agreements from the time that the defendant was first furnished by the Association with certified copies thereof, the defendant having for several years prior to December, 1957, regularly deducted each month from the proceeds of its purchases of milk from each of its producers who were members of the Association and remitted to the Association the dues deductions of 6¢ per hundredweight of milk purchased by the defendant which was produced by said producers who were members of the Association.

"(10) Because the officials of the plaintiff Association undertook to have the defendant revoke and rescind a 10¢ per hundredweight increase in the hauling charge made by the defendant for

transportation of the milk produced by the members of the plaintiff Association (which hauling charge increase was announced by the defendant on September 17, 1957, effective September 16, 1957), and because the plaintiff Association brought the matter of the hauling increase to the attention of the North Carolina Milk Commission when the defendant declined to rescind the hauling charge increase, the defendant decided to embark upon a course of conduct designed to induce, or to attempt to induce, the aforesaid thirty-nine members of the plaintiff Association to breach their contracts with the Association.

"(11) On December 24, 1957, the defendant delivered to all producers whose milk was being purchased by the defendant, including each of the aforesaid thirty-nine members of the Association, a mimeographed letter as follows: 'December, 1957 TO OUR PRODUCERS: We have had numerous requests to discontinue taking out dues for the Carolina Milk Producers Association. If you want this done please sign below and either drop it in the mail or give to your hauler to give us. Sincerely, MELVILLE DAIRY, INC., Ralph H. Scott.' 'December 1957 TO MELVILLE DAIRY, INC.; Please discontinue deducting the 6¢ per hundred pounds of milk from my check for the Carolina Milk Producers Assoc. as of Dec. 1, 1957. Signed _____ Can No. _____.' Beginning with the payments made on or about January 15, 1958, (being the payments for the milk delivered to the defendant in the month of December, 1957, Melville Dairy stopped deducting and remitting to the Association the 6¢ per cwt. which it had previously been deducting from the amounts due by Melville Dairy to the members of the Association for their milk delivered to Melville Dairy, and no such deductions have been made by Melville Dairy for the Association from that time up to the commencement of this action. On or about April 1, 1958, the defendant received from the plaintiff the letter hereinafter referred to in Finding of Fact Number (13). During the month of April, 1958, the defendant notified all its producers, including each of the thirty-nine members of the Association whose milk was being delivered to Melville Dairy, these being the members listed in paragraphs (3) and (4) hereof, to attend a meeting to be held in the County Courthouse at Graham, North Carolina, on April 14, 1958. Such meeting was held at that time and was attended by most of the Association's members whose milk was being sold to the defendant. At this meeting the defendant's President and General Manager, Mr. Ralph H. Scott, and the defendant's attorney both spoke to the members of the

Association attending the meeting, and the members were advised that mimeographed or typed slips had been prepared by the defendant for the signatures of those members who desired that payments for their milk be made directly to the Association. Only three of the Association's members signed the slips which had been prepared by the defendant for use at this meeting, and one of these members subsequently repudiated his signing of the same. Thereafter, the defendant did remit to the Association the total proceeds of the milk received by the defendant from N. R. Hargrove and George S. Woody, the two members who did sign the slips hereinabove referred to.

"(12) By its conduct during the period from December of 1957 through the month of April, 1958, including its actions hereinabove set forth in paragraph (11) hereof, the defendant, acting through its officers and agents, including particularly its President and General Manager, Ralph H. Scott, knowingly induced, or attempted to induce, the aforesaid thirty-nine members of the plaintiff Association to breach their respective milk marketing contracts and membership and marketing agreements with the Association which were then in full force and effect between the Association and its said members. The defendant's conduct in knowingly inducing or attempting to induce, the aforesaid members of the Association to breach their contracts and agreements with the Association was a course of conduct which was without just cause and which was not privileged."

(13) In addition to the above, the court found that the plaintiff had demanded of the defendant to remit to it all amounts due its members for milk which they had delivered to the defendant.

(14) The plaintiff was entitled to recover under (13) above a total for March, April, May and June, 1958, the aggregate sum of $74,553.73.

Findings Nos. 15 and 16 are here quoted in full:

"(15) Not only did the defendant fail to remit to the plaintiff the entire proceeds of the sale of the milk received by the defendant from the aforesaid producers who were members of the plaintiff during the months of March through June, 1958, but the defendant also failed and refused to remit to the Association the dues of 6¢ per cwt., which the plaintiff Association was entitled to receive for the months of December, 1957, through June, 1958.

"(16) The Court observed the demeanor of the witnesses when they testified upon the witness stand. The success of the defendant's efforts to bring about a termination of contractual and other

relations between said members of the Association and the Association is demonstrated by the fact that at the time of the trial the evidence disclosed that only ten of the aforesaid thirty-nine members were still members of the Association."

Upon the foregoing findings, the court concluded:

"(1) The milk marketing contracts referred to in paragraphs (3), (4) and (6) above were valid, subsisting and enforceable contracts.

"(2) The defendant recognized the validity and enforceability of said contracts by its making the dues deductions and the remittance of same to the plaintiff for a period of several years.

"(3) By its conduct during the period from and including December 1957, through April, 1958, the defendant violated G.S. 54-157, in that the defendant, acting through its officers and agents, knowingly induced, or attempted to induce, the aforesaid thirty-nine members of the plaintiff Association to breach their respective milk marketing contracts and agreements with the Association, and therefore the defendant is liable to the plaintiff in the penal sum of $500.00 for its inducing, or attempting to induce, each of said members to breach each of said contracts; and the plaintiff is entitled to have judgment against the defendant for the recovery of the penal sum of $19,500.00. While it is alleged in the complaint that the defendant's conduct consisted of two separate and distinct inducements, or attempts to induce, the breaches of said contracts and agreements, the Court finds that the defendant's course of conduct was a continuing act which constituted one over-all inducement, or attempt to induce, a breach as to each of said contracts and agreements within the meaning of G.S. 54-157.

"(4) The conduct of the defendant in inducing or attempting to induce the aforesaid breaches of the contracts between the plaintiff Association and its said thirty-nine members was without any justification in fact or in law and was not privileged.

"(5) Under the terms of the milk marketing contracts hereinbefore set out, the plaintiff had the right to collect in its own name all the money owed by the defendant for the milk delivered by the thirty-nine members of the Association who are named in Paragraphs (3) and (4) above for the months of March, April, May, and June, 1958. The plaintiff received only the proceeds of the Neal R. Hargrove and George S. Woody milk. Therefore the plaintiff Association is entitled to recover of the defendant the sum of $74,553.73, being the entire proceeds payable for the milk

delivered by the remaining thirty-seven producers (excluding N. R. Hargrove and George S. Woody) to the defendant during the months of March, April, May, and June of 1958. However, since the defendant has heretofore paid these amounts directly to the producers, as a matter of equity the defendant should not be compelled to pay the sums twice. Since a judgment for the entire proceeds of the milk delivered by said thirty-seven producers would result in an unjust enrichment of the aforesaid members at the expense of the defendant, if the defendant were required to pay the same, and since it would, therefore, be necessary to provide in such a judgment that the plaintiff should hold the proceeds thereof as an equitable trustee for the defendant, subject only to the deduction of the dues of 6¢ per cwt., to which the plaintiff is entitled upon the milk delivered by said thirty-seven members to the defendant during the period from March, 1958, through June, 1958, both inclusive, less the amounts of such dues as have been paid directly to the plaintiff by some of said members, the monetary recovery to be had by the plaintiff against the defendant should be only in the amounts of said dues which the plaintiff would have been entitled to deduct from the proceeds of said milk payments if the same had been remitted by the defendant to the Association, which amounts are as follows: March, 1958, $120.75; April, 1958, $121.96; May, 1958, $140.89; June, 1958, $155.82."

The court rendered Judgment:

"(1) That the plaintiff shall have and recover of the defendant the penal sum of $19,500.00;

"(2) That the plaintiff shall have and recover of the defendant the sum of $120.75, together with interest thereon from April 15, 1958, until paid, the sum of $121.96, together with interest thereon from May 15, 1958, until paid, the sum of $140.89, together with interest thereon from June 15, 1958, until paid, and the sum of $155.82, together with interest thereon from July 15, 1958, until paid; and

"(3) That the costs of this action to be taxed by the Clerk shall be paid by the defendant."

The defendant filed detailed exceptions to all findings of fact and conclusions, and appealed.

*Robert F. Moseley, and Jordan, Wright, Henson & Nichols, for plaintiff, appellee.*

*McLendon, Brim, Holderness & Brooks, By: Hubert Humphrey for defendant, appellant.*

HIGGINS, J. The evidence in this case is voluminous. The record and briefs comprise more than 700 pages. Actually, however, there is little material conflict in the testimony. The disagreement arises over (1) the permissible deductions and inferences which may be drawn from the evidence, and (2) the rights of the respective parties under the marketing contract and the law applicable thereto.

The plaintiff is a co-operative association made up of milk producers in Piedmont and Southeastern North Carolina. It was organized in 1953 with its principal office in the city of Greensboro. At the times here involved its membership was approximately 1,000. A number of distributors or processing plants operate in the territory. Prior to the organization, many of the milk producers had been selling to these processing plants. Membership in the Association was established by contract described in the factual statement as A. The members appointed the Association their agent for the purpose of marketing milk and they agreed to deliver milk to the Association or its nominee. The Association agreed to account to the member (after deductions) for all milk which it sells for the members and retain such costs as are considered a fair part of the Association's operating expenses. No provision is made for other membership dues. The directors fixed 6¢ per hundred pounds of raw milk as a membership fee. Subsequently a revised contract designated as B was executed. By B the member authorized the Association to sell milk in its own name and deal with it as its own; to authorize the purchaser to pay in whole or in part to the producer; or to collect in its own name for all or any part of the purchase price for all milk owned or controlled by the member. In accounting to the member, contract B provides for a deduction of 6¢ per 100 pounds as Association dues, and with certain other small incidentals, the Association was required to account to the member for the remainder. While a valid distinction may be drawn as to the Association's rights under each contract, however it is not necessary for us to distinguish these rights, hence we construe the two contracts together, giving the Association its rights under both.

Both contracts determined rights and liabilities of the member and the Association. Neither Melville, the processor here involved, nor any other dairy was a party to the contract. The right of the Association, in this case, to recover against Melville arises, if at all, by operation of law and not upon the membership contract. The plaintiff seeks to invoke the penal provision of G.S. 54-157 which provides:

> "Any person or persons, or any corporation whose officers or employees knowingly induces or attempts to induce any member or stockholder of an association organized hereunder to breach

his marketing contract with the association, or who maliciously and knowingly spreads false reports about the finances or management thereof shall be guilty of a misdemeanor and subject to a fine of not less than one hundred dollars ($100), and not more than one thousand ($1,000) dollars, for such offense and shall be liable to the association aggrieved in a civil suit in the penal sum of five hundred dollars ($500) for each such offense:"

The statute makes it a criminal offense if a processor induces or attemps to induce a member of the Association to breach his contract of membership. It also provides a penalty of $500.00 payable to the Association for inducing or attempting to induce a breach. In view of our decision, it is unnecessary to decide whether the statute contemplates a separate penalty as to each member, or whether it is proper to charge only one penalty for the offense.

The Melville Dairy began operation as a milk processing plant in 1927, first as a proprietorship owned by Ralph Scott, converted in 1934 into a partnership, and incorporated in 1953. Ralph H. Scott has been in charge from the beginning. He is now President and General Manager. Many of the members of the Association have been his customers over the years. In the early days raw milk was carried in cans by independent truck operators from the producer's home to the processing plant. However, in order to establish closer contact with the producer and thereby assure a steady supply, Scott "bought up the truck routes and the trucking equipment and thereafter operated the trucks from the producer's home to the plant." As a part of the operation, Scott, and later the corporation, sold to producers certain supplies and equipment useful in carrying on their dairy operations.

The evidence disclosed that the relationship between the producer and Melville Dairy continued along the same lines and did not materially change because of producer membership in the Association, except in one particular. After the Association certified the membership contract to Melville, Scott checked with the members and upon their approval deducted the monthly dues fixed by the Association and transmitted them to the Association. After the request for the deduction by the Association and before compliance, Melville obtained the approval of each producer. The plaintiff contended and the court found that Melville thus recognized the validity of the membership contract. However, there is a fundamental distinction between recognizing the contract as valid between the Association and the producer, and consenting to be a party to and bound by it. The record is bare of evidence that Melville acted other

than as a courtesy both to the Association and to its members. The Association manager, Mr. Lytle, evidently held this view and by letter expressly thanked Melville for deducting and transmitting dues — at the same time stating that other processors had refused to do so. The letter indicates Mr. Lytle was not asserting any claim of right to have the dues deducted. From the evidence presented, it appears that Melville deducted and transmitted dues in the main as a favor to and for the convenience of its customers, each of whom was thus spared the necessity of sending a separate check each month. The evidence discloses that Melville did not rely on the contract but obtained the personal approval of each producer before it actually began the deduction of dues. The collection in so far as the Association was concerned was a task Melville voluntarily assumed, and which it had a right voluntarily to abandon. Ordinarily, a courtesy, even if continued, does not ripen into a legal right. "The law declares that 'everyone has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent.'" *Iselin & Co. v. Saunders*, 231 N.C. 642, 58 S.E. 2d 614.

In September, 1957, the North Carolina Milk Commission ordered an increase of 30¢ per 100 pounds in the price of Grade One Milk. For some reason undisclosed the Association opposed the increase. Melville at the time decided to put into effect a 10¢ per 100 pounds increase in its hauling charge. A committee of producers headed by Mr. Hargrove, plaintiff's director for District No. 2, called on and conferred with Mr. Scott with reference to the proposed increase. Mr. Scott, for the defendant, said that he would recheck the transportation costs and would confer further with the committee. In the meantime, without notifying Melville, the Association filed a protest to the increase with the North Carolina Milk Commission. The differences with respect to the proposed increase were adjusted by an agreement that the producers would improve the side roads and entrances to their milk houses and Melville would cancel its proposed increase. In the meantime, the Milk Commission held a hearing but made no disposition of the protest. The Commission never exercised the authority to order a processor to deduct membership dues as authorized by G.S. 106-266.12. *State ex rel Milk Commission v. Galloway*, 249 N.C. 658, 107 S.E. 2d 631; Milk Control in the United States, 38 N.C.L.R. 420.

As an outgrowth of Melville's proposed increase in the hauling charge, officers of the Association initiated a drive to have its members switch from cans to refrigeration tanks. The Association discussed plans to purchase tank trucks and take over the hauling. When

it became known to the members that the switch would require each producer to make an additional investment of $1,800 to $2,500, dissatisfaction developed.

From the evidence of the members who testified at the hearing, the proposed switch to refrigeration and the cost thereof precipitated the trouble between the Association and its members. Melville's producers began notifying Scott to cease deducting Association dues. Scott, for Melville, sought the advice of the Milk Commission. He was told that similar requests were being made by other producers. The secretary gave this advice: "Have something in writing." Thereafter Melville sent out this memo and ballot: "We have had numerous requests to discontinue taking out dues for the North Carolina Milk Producers Association. If you want this done sign below and either drop it in the mail or give it to your hauler to give to us." Enclosed with the memo was the following: "To Melville Dairies, Inc.: Please discontinue deducting 6¢ per 100 pounds from my check for the North Carolina Milk Producers Association as of December 1, 1957." At the time, the deductions were being made. A change required an affirmative vote. Such seems to be in accordance with the proper statement of an issue. After the returns were in Melville ceased to make the deductions and paid in full to the producers.

Thereafter the Association's attorney made demand upon Melville either to deduct and transmit the dues or, as an alternative, to send to the Association the check for all milk sold by all members of the Association. The letter cited the memo and ballot as a threat or an attempt to have the member breach his contract with the Association "for which the court will furnish adequate civil relief." As a result of this demand, Melville called a meeting of its producers (to coincide with another producer meeting) to be held at the Courthouse in Graham on April 14. After the All-Jersey program was concluded, Mr. Scott stated to the members, "someone is likely to get sued. I am in the middle and I don't want my customers suing me." Slips or ballots were furnished and the members were invited to sign and make their wishes known. The memorandum provided: "This is to authorize Melville Dairy, Inc., to send my check (less my N. C. Milk Commission dues) to the Carolina Milk producers Association." This ballot also required an affirmative answer to signify a change. Only three members authorized the sending of their milk checks to the Association. One later withdrew his authorization. The requests of the two were followed.

The evidence indicates a studied effort on the part of the Association's manager, Mr. Lytle, to collect dues from Melville Dairy rather than from the members themselves. He stated the Association would

not sue the members. When Grady Perry terminated his contract in the manner provided, he offered to pay his back dues. Lytle said, "No, he would get it out of Ralph Scott." When Ralph Woody terminated his contract he told Lytle he wasn't going to pay any more dues. "He (Lytle) said it didn't make a damn to him. . . . 'I am going to collect them out of Ralph Scott.' "

A fair analysis of the evidence fails to show wherein Scott or Melville exceeded the bounds of business propriety and legitimate self-interest either in its dealings with the committee with respect to the increase in the hauling, or its request for written instructions, or its refusal to send each producer's milk check to the Association against the will and direction of the producer who sold the milk.

Great emphasis is placed on the time in which Melville sought to increase its hauling charge. Fairly appraised it would seem that if the facts justified an increase, the appropriate time to make it would be coincident with the advance in the price to the producer. At any rate the controversy over the proposed increase was amicably settled and adjusted by the cancellation of the increase by Melville and the improvement of the roads and driveways by the producers. Melville had purchased the routes and equipment from the former truckers in order to have direct contact with its customers. If the Association took over the transportation this contact would be lost. Melville, therefore, had an interest in continuing to haul raw milk. The plan of the Association to install refrigeration triggered the opposition of the members to tanks because of the initial cost. Members of the Association began notifying Melville to cease withholding Association dues. The evidence does not show a single instance where any producer actually violated the contract. The evidence shows that cancellation was in accordance with the provisions of the contract.

Both the Association and the trial judge realized the failure of the evidence to show a breach, but sought to hold Melville upon the ground that Scott, as President and Manager, knowingly attempted to induce members of the Association to breach their marketing agreements. In this connection it is worthy of note that not one member of the Association testified or suggested that Scott or any other person representing Melville attempted to induce him to breach his contract. Every member, or former member, who testified on the subject stated that he made up his own mind. The plaintiff's entire claim is based (1) on the memo and ballot sent to the producers in December, 1957, (2) the ballot offered at the April 14, 1958, meeting, and (3) the timing of Melville's proposed increase in its hauling charge to coincide with the 30¢ per hundred pounds increase in the price of Grade One Milk.

It must be remembered that during the entire controversy the Association did not sell or offer to sell, a single pound of milk. Not once did the Association confer with Melville with reference to any sale, or proposed sale. The producer in each instance made the sale of his own product in the customary manner. When Melville bought under these circumstances it is certainly understandable why it refused to pay the Association the full purchase price without specific authority from the producer. Melville's milk supply depended upon its amicable relationship with its producers. Neither common sense nor law required it to violate the producers' specific instructions respecting payment for their own products purchased in the usual course of business. In this respect the defendant sought the advice of the Milk Commission and followed that advice. By so doing its motives, without proof, cannot be presumed to be evil. A man who contemplates wrongdoing does not consult the police.

The plaintiff cites *Pure Milk Association v. Kraft,* 8 Ill. App. 2d 102, 130 N.E. 2d 765, as authority for contending the letters and ballots to the producers constituted an attempt to induce a breach of the membership contract. The letter in the *Kraft* case, after reciting demand of the Association and Kraft's refusal, contained this statement: "For over 40 years we at Stockton have valued the privilege of serving and working directly with our patrons, and we sincerely regret that this relationship must be changed in any respect." No such statement was ever made by Melville. The *Kraft* case was an equity proceeding to restrain the breach of contract. The decision, although by an intermediate appellate court, was against holding the processor for collecting dues. In *Rinnander v. Denver Milk Producers* (Colo. 1946) 166 P. 2d 984, the defendant offered a member 2¢ per pound more for his milk, thereby attempting to induce a breach.

Here we have a request by Melville for written instructions from its customers on a matter in which the private oral instructions conflicted with the claims advanced by the Association. The defendant made no attempt to influence the free expression of views. The request was merely an attempt to comply with Mr. Whitaker's advice that, in the dispute which was widespread between members and the Association, the processor should have directions in writing. After all, Melville had an arrangement to do the hauling before the Association was organized. Was it wrongful for it to insist on buying the milk and picking it up at the home of the producer?

When the evidence is analyzed, can it be said that there is anything of substance indicating an attempt to induce a breach of the membership contract? The statute involved is highly penal. The attempt to induce a breach is a criminal offense. The penalty provided

is in the nature of additional punishment. "That penal statutes must be construed strictly is a fundamental rule. The forbidden act must come clearly within the prohibition of the statute for the scope of a penal statute will not ordinarily be enlarged by construction to take in offenses not clearly described; and any doubt on this point will be resolved in favor of the defendant." *State v. Mitchell,* 217 N.C. 244, 7 S.E. 2d 567; *Childress v. Abeles,* 240 N.C. 667, 84 S.E. 2d 176. "One who seeks to recover a penalty imposed by statute must bring his case clearly within the terms of the statute." 70 C.J.S., Penalties, Construction of Statutes, p. 390. In the view we take of this case it is not necessary for us to determine whether a separate penalty may be assessed for each member or whether one penalty only may be assessed for the offense.

In the closing pages of its brief, the plaintiff makes this concession: "We have made no contention that the plaintiff had the legal right under the membership contract to require the defendant to make the 6¢ per cwt. deductions and to remit them to the plaintiff." This concession admits as unjustified the Association attorney's first demand in the letter of December 30, 1957, that the defendant deduct and transmit dues. The plaintiff, does, however, contend that the demand for the full payment of all milk was proper and required Melville to make payments to the Association regardless of the producer's wishes. The marketing contract authorizes the Association to collect from Melville for all milk sold by all producers. It permitted the Association to deduct membership dues and obligated it to pay the remainder to the respective producers. By this method of accounting the Association received membership dues and the producer received pay for his milk and credit for his dues.

The plaintiff realizes the producer is not entitled to be paid twice for his milk; and Melville should not be required to pay twice for it. However, the plaintiff contends that Melville should be required to honor the assignment in the contract and should pay in full to the Association; that the Association retain membership dues and account to the producer for the remaining amount due. Melville then has the legal right to call on the producer to return the price paid in the first instance for the milk for the reason that his keeping it would amount to unjust enrichment.

In the main the court seems to have adopted the plaintiff's theory of the case. The court found the plaintiff is entitled to recover $74,-553.73. Whereupon the plaintiff becomes liable to pay the producer the amount collected for his milk, less his membership dues. "But the defendant having paid that amount to the producers, as a matter of equity, the defendant should not be compelled to pay the same

twice . . . The monetary recovery to be had by the plaintiff against the defendant should be only the amount of said dues."

The evidence is undisputed that Melville paid the producer in full for all milk delivered. The producer has received the money out of which he is obligated to pay dues to the Association. That duty arose under his contract, for which he is primarily liable. He may or may not have paid the dues. On that question the finding is silent. A third party cannot be held for a payment without a finding that the party primarily liable has failed to meet the obligation. The court did find that Melville had not paid the dues but there is no finding the producer did not pay them. The court's judgment requires Melville to pay the dues after having paid in full for the milk. The judgment permits the producer to escape payment, or, if he has paid, then it permits the Association to collect twice: once from the member and once from Melville. The plaintiff insists the judgment for the dues should stand. To use a slang expression, this Court does not buy the argument.

The court sat as judge and jury. The findings of fact are conclusive on appeal if supported by any substantial evidence. However, the court's conclusions from the facts found involve legal questions which are subject to review on appeal. Actually, in this case many of the stated findings are inferences and conclusions from facts which are not in serious dispute. The rule in such cases is, "Every inference must stand upon some clear and direct evidence, and not upon some other inference." *Lane v. Bryan*, 246 N.C. 108, 97 S.E. 2d 411. However, when the actual evidence is carefully analyzed, when it is both weighed and measured, it is insufficient to support a finding the defendant attempted to induce any member of the Association to breach his marketing contract. "When the proved or admitted facts are consistent with any reasonable theory of good faith and honest intent, they should be so construed." 37 C.J.S., § 115, p. 438. The plaintiff has failed to show by facts, and the legitimate inferences from them, that on either of the alleged causes of action it is entitled to recover.

The judgment is

Reversed.