CITIES SERVICE GAS COMPANY, a
corporation, Plaintiff in Error,

v.

John CHRISTIAN and Laura Ona Christian,
Defendants in Error.

No. 37671.

Supreme Court of Oklahoma.

June 2, 1959.

O. R. Stites, Gordon J. Quilter, Oklahoma City, Hardin Ballard, Purcell, for plaintiff in error.

George Bingaman, Purcell, for defendants in error.

BERRY, Justice.

The defendants in error, John Christian and Laura Ona Christian, husband and wife, hereafter referred to as "plaintiffs", instituted this action against the plaintiff in error, Cities Service Gas Company, a corporation, hereafter referred to as "defendant", to recover damages in the amount of $1,512.50, which plaintiffs alleged resulted from defendant laying a gas pipe line across the W/2 of Sec. 9, T. 36N, R. 2W, McClain County, Oklahoma. The plaintiffs owned the NW/4 of said section and held a 3-year cash lease or pasture lease on the SW/4 thereof, which lease expired December 31, 1956.

In September, 1953, defendant, acting by and through a Mr. L. White, called upon the plaintiffs for the purpose of obtaining from the right-of-way pipe line easements over and through the above referred-to half section of land. The pertinent portions of the easement covering the NW/4, which was obtained as a result of Mr. White's negotiations, are these:

"* * * convey * * * a Right-of-Way to construct, reconstruct, renew, operate, maintain, inspect, alter, replace, repair and remove a pipe line, for the transportation of gas, oil, petroleum, or any of its products, water and other substances, and such drips, valves, fittings, meters and other equipment and appurtenances as may be necessary or convenient for such operations, over, and through the following real estate * * *.

"As part of the consideration hereof, Grantee agrees, upon Grantor's written request therefor, to make a tap upon its gas pipe line constructed hereunder at a point nearest the principal dwelling house now on said land, and sell, or cause to be sold, to Grantor at said connection natural gas for domestic purposes in the principal dwelling house now on said land * * *.

"Grantee shall also pay reasonable damages to growing crops, fences or

improvements occasioned in laying, repairing, or removing all lines, drips and valves. If the amount of damages be not agreed upon, it shall be determined by three disinterested persons, one appointed by the Grantor, one by the Grantee, and the third by the two so appointed, and their written determination of amount shall be final and conclusive. Grantee shall bury pipelines below plow depth.

"It is understood that the person securing this grant is without authority from Grantee to make any agreement in respect of the subject matter hereof not herein expressed."

The monetary consideration recited in the above referred-to easement was $1. The plaintiffs, however, received $1 a rod or $160 in consideration of their granting the easement.

The body of the easement covering the SW/4, which was also obtained as a result of Mr. White's negotiations, reads as follows:

"This Agreement, made and entered into this 2 day of Sept., 1953, by and between John Christian and Cities Service Gas Company,

"Witnesseth:

"In consideration of the herein contained covenants and agreements of Cities Service Gas Company, the undersigned tenant, renter and in possession of the herein described land, hereby grants unto Cities Service Gas Company the right, permission and privilege of installing, laying and removing a pipeline upon, across and from the following land, namely:

"SW¼ Sec. 9 – T 6 N – R 2 W McClain Co. Okla.

"Cities Service Gas Company hereby agrees to pay reasonable damages to growing crops, fences, or improvements occasioned in laying, installing, or removing said pipe line upon, across or from said land, and when necessary will bury said pipeline below plow depth."

No monetary consideration was recited in the last above referred-to easement and none was paid. The plaintiffs do not, however, claim that this easement is a nullity because of want of consideration and to the contrary base this action upon breach of the conditions contained in this and the easement covering the NW/4 to the effect that defendant would pay damages to growing crops and improvements.

At the time the easements were obtained no one knew the precise route of the pipe line right-of-way other than it would be laid upon and over the entire length of the W/2 of Sec. 9, therefore no one knew the exact nature or extent of the damages or destruction which would result from the pipe line being laid across said half section.

One of the plaintiffs was permitted to testify over defendant's objection that Mr. White advised him and a Mr. Morgan, one of the plaintiff's neighbors, before they signed the easements that the phrases "growing crops" and "improvements" used therein would cover and include all damages done as a result of building the pipe line. Mr. Morgan appeared as a witness but was not permitted to testify concerning Mr. White's statements to the foregoing effect.

At the time plaintiffs leased the SW/4 same had been devoted to row crops. Prior to executing the easement covering said quarter plaintiff built a pond on said quarter which pond was fed by a spring. They had fertilized the quarter by using rock phosphate and lime. Following the use of the fertilizer, plaintiffs, in 1953, seeded the quarter to blue-stem grass and vetch and rye which was intended for use as pasturage. A road over the quarter was used by plaintiffs in feeding stock kept and pastured thereon when it was necessary to feed same.

Prior to executing the easement covering the NW/4, plaintiffs had fertilized that portion of the quarter over which the pipe line was built by using rock phosphate and lime. Following the use of said fertilizer the South portion was seeded to wheat and

vetch. The plaintiffs intended to pasture the wheat and vetch during the fall and winter of 1953–54 and harvest the grain and seed in the summer of 1954. The North portion of the quarter was seeded to blue-stem grass for pasturage. In 1953 a number of native pecan trees were growing on the North portion of the quarter.

As a result of building the pipe line upon and over the W/2 of Sec. 9, blue-stem grass, wheat and vetch and rye and vetch covering the strip of land varying from one chain (66′) to 180′ wide and one mile in length was destroyed. Along the route of the pipe line top soil was turned under and subsoil which was turned up was spread over the land near the ditch where the pipe was laid. As a result of said action, rock phosphate and lime used in fertilizing this portion of the half section was lost. The spring which fed the pond on the SW/4 was covered with dirt to the extent that it ceased to flow and feed the pond and no stock water was available from the spring. Seven pecan trees growing on the NW/4 which were eight years old and from 6 to 8″ in diameter were uprooted and destroyed. Plaintiffs were unable to use the road over the SW/4 for approximately 30 days during which period they were daily forced to use a circuitous and longer road to feed cattle pastured on said quarter.

In their petition the plaintiffs alleged in substance that they were entitled to recover damages under the terms of the easements as follows:

a. Damages to blue-stem grass and rye and vetch on the SW/4, $250.00 (allowed in full by trial court.)

b. Damages to pond improvements on SW/4, $250.00 (allowed in full by trial court).

c. Damages to wheat and vetch on NW/4, including loss of pasturage, $182.50 (allowed in full by trial court).

d. Damages to road improvements on SW/4 by obstruction of roadway, $30.00 (allowed in full by trial court).

e. Damages to blue stem on NW/4, $100.00 (allowed in full by trial court).

f. Damages to land on NW/4 through loss of fertilizer and the necessity of leveling, refertilizing and reseeding, $100.00 (the trial court allowed $200.00).

g. Damages resulting from loss of 7 pecan trees on the NW/4, $350.00 (allowed in full by trial court).

h. Damages resulting from loss of future crops through land, 80′ wide and 2600′ long on NW/4, being rendered non-productive for a number of years, $250.00 (disallowed in its entirety by trial court).

During the trial plaintiffs requested and were granted permission to amend their petition to seek damages to pecan trees in the amount of $500 and reduce damages sought for future damages to crops from $250 to $100, thus leaving the total damages sought at $1,512.50.

The parties waived a jury and tried case to the court. The trial court entered findings of fact and conclusions of law. As above indicated the trial court found that plaintiffs were entitled to damages in the aggregate amount of $1,362.50, and having so found entered judgment in plaintiffs' favor for said amount, together with interest at the rate of 6% per annum from January 1, 1954, which was considered as the date that damages occurred, and the costs of the action.

The trial court's Finding No. IX reads as follows:

"That at the time the 'Right-of-way' agreements were secured by Defendant, the exact course of said pipe line was unknown to the parties hereto, so said instruments were drawn in such a manner as to permit the entry and crossing by defendant at points to be subsequently determined by it. To secure such instruments, the agent of Defendant represented to Plaintiffs that any and all damages would be compensated after the pipe line was laid and the damages determined."

The defendant filed motion for new trial in which it alleged 59 errors. From order

overruling its motion for new trial, defendant perfected this appeal. In its petition in error with casemade attached, defendant alleged 54 errors. The alleged errors are predicated upon the proposition that the provisions of the easements may not be varied by parol evidence; that the phrases "growing crops" and "improvements" used in the easements do not cover nor include the destruction of or damages to blue-stem grass, native pecan trees, leveling land, fertilizing land, inconvenience from being unable to use road, or loss of fertilizer; that evidence by which plaintiffs sought to prove their damages was inadmissible and that plaintiffs did not prove damages; that interest was only allowable from date the damages were established by judgment.

As we read the authorities, we are privileged in determining the meaning that should be given the phrases "growing crops" and "improvements" as used in the easements, to place ourselves in the position of the parties at the time the easements were executed and to construe said phrases in such a way as to make the easements reasonable and fair under all of the facts, and adopt a construction which will tend to carry out the intent of the parties to the easements at the time same were entered into. We are, therefore, privileged to take into consideration that if defendant had obtained the easements in controversy by way of condemnation, plaintiffs would have been entitled to recover damages if properly established to all property or property rights that were destroyed, damaged or impinged upon (Art. 2, Sec. 23); that plaintiffs received no monetary consideration for signing the easement covering the SW/4; that at the time said easements were signed the parties knew that some blue-stem grass on the SW/4 would be destroyed and that the pond thereon might be damaged, and that the parties also knew that blue-stem grass on the NW/4 would be destroyed, and that some of the pecan trees on the quarter would probably be destroyed; that in good conscience plaintiffs were entitled to be compensated in damages for losses resulting from the construction of the pipe line over the W/2 of Sec. 9.

In National Products Co. v. Magnolia Petroleum Co., 175 Okl. 596, 53 P.2d 669, 670, the following was said in the first paragraph of the syllabus:

"1. A contract must receive such interpretation as to make it lawful, operative, reasonable, definite, and capable of being carried into effect, if such can be done without violating the intention of the parties."

We quoted with approval from 17 C.J.S. Contracts § 319, p. 739, and 6 R.C.L. 841, in Federal Land Bank of Wichita, Kansas v. Nicholson, 207 Okl. 512, 515, 251 P.2d 490, 495 as follows:

" 'The words of a contract will be given a reasonable construction, where that is possible, rather than an unreasonable one, and the court will likewise endeavor to give a construction most equitable to the parties, and one which will not give one of them an unfair or unreasonable advantage over the other. So that interpretation which evolves the more reasonable and probable contract should be adopted, and a construction leading to an absurd result should be avoided.' In 6 R.C.L. 841, it is said:

" 'Contracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, * * * the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred. If one construction would make it unreasonable, while another

would do justice to both parties, the latter will be adopted.' "

In 12 Am.Jur. "Contracts", p. 760, the author states that "The letter of the contract is to be controlled by its spirit and purpose. The terms employed are servants, and not masters, of an intent; they are to be interpreted so as to subserve and not to subvert, such intent."

We will first consider whether the blue-stem grass represented a growing crop within the provisions of the easements in controversy.

In the Canadian Mining Co. v. Cleveland, Okl., 312 P.2d 913, 914, the mining lease involved provided that if "mining operations shall damage a growing crop on the premises the lessee shall pay unto the lessor the actual damage done to the crop." In an action to recover damages from the lessee, the lessor claimed and was allowed to recover damages to an area seeded to grasses for farm crop purposes. In sustaining the award of damages to the land seeded to grasses, we had this to say at page 915 of 312 P.2d:

"(2) By plaintiffs' evidence the meadow was seeded in contemplation of a hay crop. We think that an area seeded for the purpose of growing grasses for farm crop purposes is within the meaning of the term 'growing crops', as used in the lease contract. It follows that under the evidence recovery was justified under the terms of the lease."

On the issue under consideration the defendant cites and stresses State Mut. Ins. Co. v. Clevenger, 17 Okl. 49, 87 P. 583, which case was handed down before Statehood, as sustaining its contention that blue-stem grass does not represent a growing crop because as stated in said case "under the common and restricted acceptance of the term (crop), anything more would be understood than products from annual plants, as cereals, maize, etc."

In the last above cited case the court pointed out that Webster defined crops as "grain produced from annual vegetation, but also fruits from trees and perennial plants," and therefore in our opinion recognized that the meaning that may be given the word "crop" depends on the facts presented by a particular case. Under the facts of this case the phrase "growing crops" should, in our opinion, be given a broad and not a narrow construction.

We are of the opinion that the blue-stem grass, rye and vetch and rye and wheat under the record represented growing crops within the purview of the easements.

We next consider the proposition of whether the pecan trees were growing crops or improvements within the purview of the easements.

The word "improvement" does not have a definite and fixed meaning. At page 416, 42 C.J.S. the author has this to say:

"The word 'improvement' is a relative and very comprehensive term, whose meaning must be ascertained from the context and the subject matter of the instrument in which it is used. The term implies the prior existence of something to improve; it may be employed to designate any beneficial or valuable change or addition; * * *."

We quote from p. 197, 15 Am.Jur. "Crops":

"* * * Attention in recent times, however, has been given to the modern methods of fruit culture and the assistance afforded nature in producing fruit and other products of bushes and trees, and the better rule now regards as 'fructus industriales' a growing crop which owes its existence in its final perfection and abundance to the care and cultivation of man, even though it may proceed from perennial roots. * * *"

Beginning at page 14, 24 A.L.R.2d will be found annotated notes covering cases in which an occupant of land was allowed recovery for improvements made. At page 26 of the cited volume the author has this to say following note numbered "10":

"Fruit trees and fruit-bearing shrubs and vines are within the category of improvements for which compensation may be awarded the dispossessed occupant, if they in fact add to the property."

██ We take judicial knowledge that for many years pecans have annually been harvested in Oklahoma from both native and so-called paper-shell pecan trees; that there has long been a ready market for pecans from such trees and that pecan trees are considered to be valuable property.

Under the facts of this case, we are of the opinion that the native pecan trees in controversy represented a growing crop or improvement within the provisions of the easements, and we are of the further opinion that the pond on the SW/4 also represented an improvement and that damage to the spring which was an integrated part of the pond, was recoverable under the provisions of the easements.

██ In our opinion it is unnecessary to here pass upon the proposition of whether fertilizer or leveling land constituted an improvement, for the reason that the loss of fertilizer and the leveling of land was directly connected with the destruction of blue stem, rye and vetch and vetch and wheat—it was under the record necessary to level the land in order to replant and re-fertilize in order to satisfactorily reproduce that planted.

██ The record fails to show whether the road over the SW/4 was built and maintained or whether it is merely a trail across the pasture which was obstructed by the work incident to laying the pipe line. We therefore decline to hold that the road, under the record, constituted an improvement.

In considering whether there is competent evidence supporting the award of damages, we will first consider evidence relating to the destruction of rye and vetch and blue-stem grass on the W/2 of Sec. 9, in connection with which loss the trial court allowed $250.00 for rye and vetch and blue stem destroyed on the SW/4; $100 for loss of blue stem on the NW/4 and $200 for loss of fertilizer and cost of leveling land in order to reseed same, for an aggregate award of $550.

The plaintiff testified that he had farmed for twenty-four years. He was then asked this question:

"Q. Based upon your experience as a farmer, your experience with wheat and vetch, and your knowledge and opportunity to observe the condition of this crop of wheat and vetch that you had growing on this land of yours, at and immediately prior to the time this pipeline was constructed, and based upon your knowledge of the area or extent of that crop destroyed by this pipeline operation, do you have an opinion, in December, 1953, as to what the reasonable value, market value of that crop of growing wheat and vetch was at the time it was destroyed in December, 1953 in the area that was taken for this pipeline, answer yes or no?"

The plaintiff answered the quoted question "Yes I do." He subsequently testified that the wheat and vetch averaged $73.80 an acre and that damages resulting from the loss of 2½ acres of the wheat and vetch crop was $175; that value of the rye and wheat for pasturage was $3 an acre or $7.50. The figures given apparently did not include the cost of leveling the wheat and rye ground and refertilizing same.

██ The rule for measuring damages arising from injury or destruction of a growing crop is laid down in the seventh paragraph of the syllabus to Garrett v. Haworth, 183 Okl. 569, 83 P.2d 822, 823, as follows:

"7. In an action for damages for injury to growing crops, the measure of damages is the value of the unmatured crops at the time of the injury. In arriving at such value, it is proper to show by evidence the probable yield under proper cultivation, and the value of such probable yield when matured, gathered, prepared, and

ready for sale; also the probable cost of proper cultivation necessary to mature the crop, as well as the cost of gathering, preparation, and transportation to market. The difference between such probable value in the market and the cost of finishing the cultivation, and gathering, preparing and transportation to market, will represent the value at the time of loss."

 The question heretofore quoted was phrased in such a way as to cover the "reasonable value, market value of that growing wheat and vetch at the time it was destroyed in December, 1953," so it must be presumed that plaintiff's $175 figure was a net and not a gross figure, and being a net figure that the cost of combining or marketing the wheat and vetch was deducted. It is a matter of common knowledge that wheat and vetch do not require cultivation after the crop has come up to a stand. The award of $175 for destruction of the wheat is therefore sustained by the evidence. The defendant makes no complaint relative to the amount awarded as damages for loss of wheat and vetch pasturage.

We next consider the award of damages for loss of pecan trees. The plaintiff, over defendant's objections, fixed the value of each tree lost at $50 or $350. A real estate agent who testified that he was acquainted with the market value of the NW/4 before and after the destruction of the pecan trees fixed the market value of the farm at $17,000 before the loss and $16,500 thereafter, "making a reduction in value of $500.00, by reason of the destruction of these trees."

 The rule for measuring damages arising from injury or loss of trees is the value of the premises upon which the trees grew immediately prior to the destruction and the value immediately thereafter. Twin State Oil Co. v. Long, 170 Okl. 413, 40 P.2d 650; Thompson v. Boydstun, 189 Okl. 530, 118 P.2d 236, 25 C.J.S. Damages § 85, p. 613.

 The award of $350 as damages resulting from the destruction of seven pecan trees is, for reasons stated, sustained by the evidence.

 We next consider the award of damages for destruction of rye and vetch, blue-stem grass and work necessarily incident to leveling and refertilizing land on the W/2 of Sec. 9.

The plaintiff was asked the following quoted question relative to damage to rye and vetch and blue stem on the SW/4:

"Q. Now, based upon your experience as a farmer, I'll ask you what, in your opinion, was the value of the crop of rye and vetch and blue stem grass growing on the Caldwell Land for the remaining term of the lease which you held on the property which was for a term from the first day of January, 1953, to the last day of December, 1956?"

Plaintiff answered the quoted question by saying "I'd say $250.00."

Plaintiff fixed the value of blue stem destroyed on the NW/4 at $100.

The plaintiff testified that the cost of replacing fertilizer lost on the NW/4 as the result of the top soil being turned under at $50 and since the same amount of top soil was turned under on the SW/4, the loss on said quarter would also be $50 for an aggregate of $100 for loss of fertilizer. The plaintiff testified that cost of reseeding the NW/4 to blue-stem grass was $47 and the cost of reseeding the SW/4 would, of course, approximate said amount for an aggregate of approximately $94 for cost of seed. The plaintiff testified further that the value of the work necessary in reseeding the half section would aggregate $100. It follows that plaintiff established that the cost of refertilizing, releveling land, reseeding and the work necessarily incident to reseeding was approximately $294. The trial court awarded damages on account of the loss under discussion in the aggregate amount of $550, $100 of which was outside the scope of the plead-

ings and the award must therefore be reduced to $450.

■ It is apparent that it would indeed be difficult to establish the value of the blue stem destroyed. If permitted to stand and grow, the grass, if not over-pastured, would have developed a root system and the plants (stools) would have increased in size. The plants would have produced seed and thus the stand of grass would become better with the passing of time. Accordingly, the quoted statement taken from 25 C.J.S. Damages § 157, p. 806, is particularly applicable:

"It has been said that considerable latitude should be allowed with regard to evidence admissible to prove the value of a crop which has been injured or destroyed, at least where there is no fixed or determinable market value for such crop. Similarly, in establishing the damage to meadows and pastures, it would seem that any evidence which would tend to shed light on the question is admissible."

In Wichita Falls & N. W. Ry. Co. v. Gant, 56 Okl. 727, 156 P. 672, this was said in the second paragraph of the syllabus:

"In a suit for damages, where the amount recovered is not excessive and it is plainly evident that the jury was not misled by the instructions of the court, an error in the instructions on the measure of damages is harmless."

In view of the fact that John Christian, one of the plaintiffs, was an experienced farmer and livestockman, his opinion relative to the damages which resulted from destruction of rye and vetch and blue-stem grass, which was corroborated by his testimony relative to cost of reseeding, cost of fertilizing, and cost of leveling land in order to reseed, was sufficient to make a prima facie case, and in view of the fact that there is no evidence tending to refute his testimony, we are of the opinion that the record sustains an award of damages in the amount of $450 for destruction of rye and vetch and blue stem must stand.

We next consider the damage to the pond. The plaintiff testified that it would cost $250 to remove the dirt from the spring and restore same to its original condition. A witness for defendant testified that he was familiar with the work done in laying the pipe line on the W/2 of Sec. 9; that the rental on machinery necessary to (economically) remove the dirt would be $10 an hour; that it would take four hours to remove dirt "to a depth of two feet and to a width of approximately fifteen feet and for a length of approximately 150 feet", or $40, and that the cost of moving the machinery in would be $40, making a total cost of $80, not including any hand-shovel work.

The record fails to show that plaintiff had any particular knowledge or experience in moving dirt and, therefore we cannot assume that his opinion was based upon knowledge or experience. The trial court therefore erred in allowing plaintiff $250 as damages for cleaning out the spring and said award is reduced to $80 which is the amount clearly sustained by the record.

As heretofore pointed out, the record fails to develop whether the road lying on the SW/4 that plaintiff says was obstructed was in fact an improvement, and for said reason we are of the opinion that damages cannot be allowed based upon loss of use of the road.

The defendant as heretofore pointed out, contends that the trial court erred in allowing interest. The plaintiff's action is based upon breach of the agreement contained in the easements to pay damages for growing crops and improvements and for said reason 23 O.S.1951 § 22, which reads as follows, controls the issue involving interest:

"The detriment caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the obligation, with interest thereon."

■ For cases touching upon the issue under consideration, see Oklahoma City v. Hoke, 75 Okl. 211, 182 P. 692, wherein we

held that in an action for damages for the destruction of crops, interest would be allowed from date damages were sustained; Midland Valley R. Co. v. Price, 127 Okl. 106, 260 P. 26, in which we held that interest was allowable for damages occasioned by loss of steers through negligence of railroad, which damages included the market value of the streets, together with the cost of burial and disposition of same from date damages were sustained, and Fidelity-Phenix Fire Ins. Co. of New York v. Board of Education of Town of Rosedale, 201 Okl. 250, 204 P.2d 982, we held that in an action on windstorm policy for damages to a building that interest was allowable from date damages were sustained because the action was based on contract.

Under Sec. 22, supra, interest is allowable on damages that plaintiffs are entitled to recover under the provisions of the easements.

In view of the fact that we have only allowed damages which are attributable to loss or destruction of growing crops or improvements, the defendant was not prejudiced by the introduction of evidence to the effect that defendant's agent advised plaintiffs that defendant would pay all damages, which evidence apparently formed the basis of the trial court's allowance of damages for loss of use of the road, but not other damages allowed. 22 O.S.1951 § 1068.

The judgment of the trial court is affirmed subject to plaintiffs remitting excessive damages in the amount of $400, thus reducing the judgment to $962.50. In the event plaintiffs elect not to remit said amount within twenty (20) days after the court's mandate herein is handed down, then case is reversed and the trial court is directed to grant defendant a new trial.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, JOHNSON, BLACKBIRD, and IRWIN, JJ., concur.

JACKSON, J., concurs in part and dissents in part.