C.C. WALKER GRADING & HAULING, INC. v. S.R.F. MANAGEMENT CORP., A/K/A SITTING ROCK MANAGEMENT CORP., AND HELEN C. STANLEY, TRUSTEE FOR THE BENEFIT OF THE CHILDREN OF JOHN DAVID STANLEY

No. 77A84

(Filed 5 June 1984)

1. Appeal and Error § 2— dissent in Court of Appeals—no dissenting opinion— appellate procedure rules precluding further review by appeal of right

In an appeal from a decision of the Court of Appeals where one judge dissented without filing a dissenting opinion, pursuant to App. R. 16(b) which limits review of the Court of Appeals' decision to the issues which were specifically set out in the dissenting opinion, further review by appeal of right was precluded.

2. Contracts § 6.15— clearing and grading work on farm—not within license requirement for general contractor

Plaintiff's work in clearing and grading land for agricultural purposes did not bring it within the provisions of G.S. 87-10 which requires a general contractor to have a license and the provisions of G.S. 87-1 and 87-13 did not apply.

3. Principal and Agent § 6— ratification of act of agent by principal—estoppel— jury issue

In an action for monies allegedly due for work performed on a farm, the trial court erred in granting summary judgment for a defendant where there

was a conflict in the evidence as to whether the femme defendant's former husband acted as her agent and as to whether a careful and prudent person might perceive that the femme defendant's former husband had the authority to contract for the work on the farm and that the femme defendant ratified these acts.

APPEAL of right by plaintiff from the decision of the Court of Appeals, 66 N.C. App. 170, 310 S.E. 2d 615 (1984), one judge dissenting, affirming summary judgment for defendant Stanley by *Collier, J.*, at the 27 September 1982 Civil Session, Superior Court, ROCKINGHAM County. Judgment entered 18 October 1982 out of district and out of term. Heard in the Supreme Court 11 April 1984.

On 27 January 1982, plaintiff brought this action for monies allegedly due for work performed on Sitting Rock Farms beginning in March of 1979 and extending into June of that year. From the pleadings, affidavits, and depositions in the case, the following chronology of significant events is gleaned:

Carter C. Walker lives in Madison, North Carolina, has been in the grading and hauling business for about sixteen years, and is president of C.C. Walker Grading and Hauling, Inc. In the fall of 1978, Walker was approached by John David Stanley, husband of defendant Helen Stanley, about clearing a piece of land for Stanley. Pursuant to their fall 1978 negotiations, plaintiff agreed to do two jobs for Mr. Stanley related to converting wooded acreage at Sitting Rock Farms into pasture and areas for horse rings and barns. Walker described the first project, begun in the fall of 1978 and completed in the spring of 1979, as follows:

I was going to clear some property for fifteen thousand dollars, grade around the edge for fifteen hundred dollars, do the contours and terracing for three thousand dollars, and plowing seeding fertilizer and lime for thirteen thousand two hundred dollars, and some culverts, for a total contract cost of thirty-three thousand dollars.

Walker met with Mr. Stanley several times in the fall of 1978 to discuss plans for the farm. The arrangements they made were informal, the only writings between them consisting of various pages of estimates and notes passed back and forth. Some of the plans discussed that fall were for work that would not be done

until the spring. With regard to their negotiations, Walker stated that "John David Stanley referred to the work as work he and his wife wanted done." On at least two occasions in 1978, Helen Stanley was present when the two men discussed progress on these improvements, including the work to be done the following spring. Walker further recalled assurances from Mr. Stanley that "the money to pay him was coming out of the Family Trust."

The second project with Mr. Stanley called for clearing, grading and seeding land, burning stumps or brush, and rebuilding a pond on the property. By June 1979, plaintiff had completed approximately $63,300 worth of work at Sitting Rock Farms. Plaintiff was paid approximately $30,000 for work done in 1978. As of 30 June 1979, a balance of $30,452.08 remained unpaid.

Sometime early in the spring of 1979, C.C. Walker read in the local newspaper that ownership of Sitting Rock Farms had been transferred to Helen C. Stanley. At that time Mr. Walker had no knowledge of the following events leading up to and surrounding this conveyance or certain new legal relationships created thereby. Helen and John Stanley, who were married in 1953, have been separated at least since September 1982 but were still living together during the latter part of 1978 and the first half of 1979. Helen assumed trusteeship of a trust established for the benefit of her minor children by Governor Thomas B. Stanley, Sr. and his wife on 31 December 1963. In December 1974 and in December 1976, Helen borrowed from the Piedmont Trust Bank of Martinsville and Henry County amounts of $316,981.50 and $300,000, secured by the assets of the Children's Trust. The proceeds of these loans were in turn loaned to John. Helen paid off the loans in September 1978. As of 1 January 1979, John owed the trust a total of $805,136.46, the amounts borrowed, plus interest. Sometime between 1 December 1978 and 1 January 1979, the real property in question, titled in Sitting Rock Farms, Inc., was then conveyed to its president, John David Stanley, individually. At about this same time, Sitting Rock Farms, Inc. was dissolved and a new corporation was established by John Stanley, the S.R.F. Management Corporation. John Stanley was president.

On 1 January 1979, three separate transactions involving these persons and corporate entities were initiated: (1) Helen Stanley, as trustee for the benefit of the children, purchased Sit-

ting Rock Farms from John Stanley. The purchase price was $1,668,974, of which $1,400,000 was paid in cash, leaving a balance due John of $268,974.25 on the transaction. (2) A document entitled a "Loan Repayment Agreement" was enacted by and between John and Helen detailing a plan whereby John was to repay the Children's Trust the $805,136.46 he then owed. In addition to a setoff of the balance due him from the trust on the farm purchase, there was, inter alia, the following provision: "Stanley advanced through Sitting Rock Farms an additional $60,000 for improvements on the land . . . ." (3) At John's suggestion, Helen negotiated a lease agreement with the new S.R.F. Management Corporation, which included the following provision: "Lessee shall bear all expenses in maintaining the premises, including plumbing, heating, air conditioning, painting, fence repair, etc. Lessee shall maintain the premises in good condition. Capital expenditures will be made by the Lessor." This lease was never recorded.

C.C. Walker testified that he never heard anything about a lease of the property, and it was not until late spring that he first learned of the existence of the S.R.F. Management Corporation. As far as he knew, the Stanleys were still married; Walker continued to see Helen around the farm during the spring. At the direction of John Stanley, Walker also took orders that spring from the farm foreman, Granville Cox, who would authorize work that "they"—the Stanleys—wanted done.

Walker's perceptions as to the chain of authority on the farm during the early spring of 1979 were shared by Ms. Bonnie Carter, bookkeeper and later office manager at Sitting Rock Farms until February 1980. Carter testified that although she was aware of the 1 January 1979 transfer of ownership, there was no change in authority in the farm operation during the entire period of her employment. John Stanley was "in ultimate control." Helen Stanley herself informed Carter, with reference to John, "what he says goes." When persons doing business with Sitting Rock Farms, Inc. expressed concern that the letterhead, checks, and books were changed to S.R.F. Management Corporation, Ms. Carter noted, "I was given to understand that I was to reassure these people that nothing had really changed, that it was only a technical change and was still Sitting Rock Farms." At no time did Ms. Carter, present in the office daily during this period, ever hear mention of a lease of the farm to anyone.

Walker Grading & Hauling v. S.R.F. Management Corp.

On 31 October 1980, the defendant S.R.F. Management Corporation executed and delivered a promissory note for $30,000 to the plaintiff, signed by John Stanley as president. Two delinquent payments were later made on the note. Plaintiff alleges a balance due, including interest, as of 31 January 1982 of $32,335.52.

In her original answer, defendant Helen Stanley, as trustee, denied responsibility for payment of any sum to plaintiff. More specifically, she denied that S.R.F. Management Corporation ever acted as her agent in these matters. As a further defense, she cites the 1 January 1979 lease agreement, as follows:

> That under the terms of said lease the Tenant was responsible for all said maintenance and repairs and improvements on or about the premises. That the Plaintiff [sic], as Landlord, neither consented to nor acquiesced in the improvements alleged to have been effected upon the premises by the Plaintiff. That the relationship between this Defendant and SRF Management Corp. was that of Landlord and Tenant and not principal and agent.

On 27 September 1982, after all depositions, affidavits, and other exhibits had been submitted in the case, Judge Collier allowed defendant Stanley's motion to amend her answer to include the additional affirmative defense of plaintiff's noncompliance with N.C.G.S. 87-1. Plaintiff's failure to obtain a North Carolina general contractor's license until on or about 24 October 1979 barred any claim for relief, Stanley argued.

On 18 October 1982, Judge Collier granted defendant Stanley's motion for summary judgment, writing as follows:

> And the Court finding that the Court has jurisdiction over the person of the Plaintiff and the Defendant, Helen C. Stanley and over the subject matter in controversy between the parties and it further being stipulated by the Plaintiff and Defendant that the Plaintiff did not receive a license to act from the North Carolina Licensing Board of General Contractors until October 24, 1979.

The Court of Appeals upheld the decision to allow defendant's motion to amend. It did not address the question of agency and affirmed the judgment of the trial court.

*Leigh Rodenbough for plaintiff appellant.*

*John T. Weigel, Jr., for defendant appellee, Helen C. Stanley, Trustee.*

MARTIN, Justice.

**[1]**   Plaintiff appeals as of right, pursuant to N.C.G.S. 7A-30, from an opinion of the Court of Appeals which notes a dissent but does not include a dissenting opinion. We take this opportunity to set forth the relevant portion of an amendment to the North Carolina Rules of Appellate Procedure adopted by this Court on 3 November 1983, effective with notices of appeal filed in the Supreme Court on and after 1 January 1984:

> Rule 16 of the North Carolina Rules of Appellate Procedure appearing at 287 N.C. 671, 720 entitled "SCOPE OF REVIEW OF DECISIONS OF COURT OF APPEALS" is amended as follows:
>
>     . . . .
>
> 3. A new subparagraph (b) to be entitled "Scope of Review in Appeal Based Solely Upon Dissent" is hereby adopted as follows:
>
>> (b) Scope of Review in Appeal Based Solely Upon Dissent. Where the sole ground of the appeal of right is the existence of a dissent in the Court of Appeals, review by the Supreme Court is limited to a consideration of those issues which are specifically set out in the dissenting opinion as the basis for that dissent and are properly presented in the new briefs required by Rule 14(d)(1) to be filed in the Supreme Court. Other questions in the case may properly be presented to the Supreme Court through a petition for discretionary review, pursuant to Rule 15, or by petition for writ of certiorari, pursuant to Rule 21.

309 N.C. 830 (1983).

The intent of this provision is to further ensure that in appeals of right based solely upon dissent, review by this Court shall be limited to those questions on which there was division in the intermediate appellate court. Such review has never been in-

tended for claims on which that court has rendered unanimous decisions. *State v. Campbell*, 282 N.C. 125, 191 S.E. 2d 752 (1972); *Hendrix v. Alsop*, 278 N.C. 549, 180 S.E. 2d 802 (1971).

Where an appeal of right is taken to this Court based solely on a dissent in the Court of Appeals and the dissenter does not set out the issues upon which he bases his disagreement with the majority, the appellant has no issue properly before this Court. Such appeals are subject to dismissal. Application of this procedural amendment to the case at bar precludes further review by appeal of right.

Nevertheless, in this case, we deem it preferable to certify for discretionary review, on our own motion, the following determinative questions: (1) Did the Court of Appeals err in finding that plaintiff was a "general contractor" within the statutory definition and that the services rendered at Sitting Rock Farms between March and June 1979 were governed by the statute? (2) If plaintiff's noncompliance with the above requirement does not bar recovery, does defendant Helen Stanley share liability with defendant S.R.F. Management Corporation for the spring 1979 improvements on the property?

We answer each of these issues in the affirmative and reverse the decision of the Court of Appeals.

[2] With regard to the statutory provision at issue, this Court has held:

> The purpose of Article 1 of Chapter 87 of the General Statutes, which prohibits any contractor who has not passed an examination and secured a license as therein provided from undertaking to construct a building costing $20,000.00 or more, is to protect the public from incompetent builders. When, in disregard of such a protective statute, an unlicensed person contracts with an owner to erect a building costing more than the minimum sum specified in the statute, he may not recover for the owner's breach of that contract. This is true even though the statute does not expressly forbid such suits. 53 C.J.S. *Licenses* § 59 (1948); 33 Am. Jur. *Licenses* §§ 68-72 (1941); Annot., Failure of artisan or construction contractor to procure occupational or business license or permit as affecting validity or enforcement of con-

tract. 82 A.L.R. 2d 1429 (1962); 5 Williston Contracts (Revised Edition 1937) § 1630; 6 Williston Contracts, *Ibid.* § 1766; 6A Corbin Contracts §§ 1510-1513.

*Builders Supply v. Midyette,* 274 N.C. 264, 270, 162 S.E. 2d 507, 510-11 (1968).

N.C.G.S. 87-1 (Cum. Supp. 1983) defines a "general contractor" as:

> For the purpose of this Article any person or firm or corporation who for a fixed price, commission, fee or wage, undertakes to bid upon or *to construct* or who undertakes to superintend or manage, on his own behalf or for any person, firm or corporation that is not licensed as a general contractor pursuant to this Article, *the construction* of any building, highway, public utilities, grading or any improvement or structure where the cost of the undertaking is thirty thousand dollars ($30,000) or more, shall be deemed to be a "general contractor" engaged in the business of general contracting in the State of North Carolina.
>
> This section shall not apply to persons or firms or corporations furnishing or erecting industrial equipment, power plant equipment, radial brick chimneys, and monuments.
>
> This section shall not apply to any person or firm or corporation who constructs a building on land owned by that person, firm or corporation when such building is intended for use by that person, firm or corporation after completion.

(Emphases ours.)

One who acts as a general contractor must be licensed pursuant to N.C.G.S. 87-10 (Cum. Supp. 1983), which provides, in part, as follows:

> [T]he [Licensing] Board shall issue to the applicant a certificate to engage as a general contractor in the State of North Carolina, as provided in said certificate, which may be limited into five classifications as the common use of the terms are known—that is,
>
> (1) Building contractor, which shall include private, public, commercial, industrial and residential buildings of all types;

   (1a) Residential contractor, which shall include any general contractor constructing only residences which are required to conform to the North Carolina Uniform Residential Building Code (Vol. 1-B);

   (2) Highway contractor;

   (3) Public utilities contractors, which shall include those whose operations are the performance of construction work on the following subclassifications of facilities: . . .

   (4) Specialty contractor, which shall include those whose operations as such are the performance of construction work requiring special skill and involving the use of specialized building trades or crafts . . . .

N.C.G.S. 87-13 provides for a criminal penalty for violation of the licensing requirement:

   Any person, firm or corporation not being duly authorized who shall contract for or bid upon the construction of any of the projects or works enumerated in G.S. 87-1, without having first complied with the provisions hereof, or who shall attempt to practice general contracting in this State . . . shall be deemed guilty of a misdemeanor and shall for each such offense of which he is convicted be punished by a fine of not less than five hundred dollars ($500.00) or imprisonment of three months, or both . . . .

This Court has held that the statute must be strictly construed because of the criminal penalties imposed, and its scope may not be extended by implication beyond the meaning of the language so as to include offenses not clearly described. *Vogel v. Supply Co. and Supply Co. v. Developers, Inc.*, 277 N.C. 119, 177 S.E. 2d 273 (1970); *Sand and Stone, Inc. v. King*, 49 N.C. App. 168, 270 S.E. 2d 580 (1980); *Fulton v. Rice*, 12 N.C. App. 669, 184 S.E. 2d 421 (1971). Construing a statute requiring the licensing of real estate brokers and salesmen, the Court has taken care to note:

   Any violation of its provisions is declared to be a criminal offense. For this reason, and for the further reason that it is a statute restricting to a special class of persons the right to

engage in a lawful occupation, the act must be strictly construed so as not to extend it to activities and transactions not intended by the Legislature to be included. *Milk Producers Co-op v. Dairy*, 255 N.C. 1, 20, 120 S.E. 2d 548; *State v. Mitchell*, 217 N.C. 244, 7 S.E. 2d 567; *State v. Harris*, 213 N.C. 758, 197 S.E. 594.

*McArver v. Gerukos*, 265 N.C. 413, 417, 144 S.E. 2d 277, 280 (1965).

Defendants argue that the legislature, by the use of the words "grading or any improvement," intended to include the activities undertaken by plaintiff in this case. We do not agree. The guiding principle of statutory construction has been articulated as follows by Justice Barnhill:

A word or phrase or clause or sentence may vary greatly in color and meaning according to the circumstances of its use. *Towne v. Eisner*, 245 U.S. 418, 62 L.Ed. 372. It is axiomatic, therefore, that a provision in a statute must be construed as a part of the composite whole and must be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit. Its meaning must sound a harmonious — not a discordant — note in the general tenor of the law.

*Watson Industries v. Shaw, Comr. of Revenue*, 235 N.C. 203, 210, 69 S.E. 2d 505, 511 (1952).

This Court has already applied the above principle to construe the word "improvement" in N.C.G.S. 87-1 as follows:

The term "improvement" does not have a definite and fixed meaning. *Cities Service Gas Co. v. Christian*, 340 P. 2d 929 (Okl. 1959). "The word 'improvement' is a relative and very comprehensive term, whose meaning must be ascertained from the context and the subject matter of the instrument in which it is used." 42 C.J.S., Improvement, p. 416. The word is sometimes used to refer to any enhancement in value, particularly in relation to non-structural changes to land. *Mazel v. Bain*, 272 Ala. 640, 133 So. 2d 44 (1961). But where, as here, it is used in context with the words *building* and *structure*, its meaning is otherwise. As used here it connotes the performance of construction work and presupposes the prior existence of some structure to be improved.

*Vogel v. Supply Co. and Supply Co. v. Developers, Inc., supra,* 277 N.C. at 132, 177 S.E. 2d at 281-82.

We hold, following the reasoning in *Vogel,* that the term "improvement" as used in N.C.G.S. 87-1 has no application to the facts in this case where the word is used with reference to land.

Applying this same analysis, we further conclude that the "grading" intended for coverage by the statute and the "grading" undertaken by this plaintiff are clearly distinguishable. Construed in the context of the language of N.C.G.S. 87-1 and -10, quoted above, the word "grading" connotes an activity which is a part of, or preparatory for, work properly termed "building and construction." *See generally* 13 Am. Jur. 2d *Building and Construction Contracts* § 131 (1964).

Plaintiff has described his occupation as follows:

The bulk of my earlier work was the same kind of work I did for Sitting Rock Farms, that is, I would clear overgrown land for cultivation, removing stumps and bushes, pushing off undergrowth into gulleys, built terraces, farm roads and ponds. We then cultivated the cleared land, seeding and fertilizing it as pasture. That is exactly what I did at Sitting Rock Farms in that period of 1978-79. No engineering or surveying was involved setting grades. . . . We made no attempt whatsoever to change the general contours of the hills as that would have disturbed the fertile topsoil too much, but we would put in terraces and channels for runoff so that the planted pastures would be stable. After completing this phase I came back with farm tractors, plowing and harrowing. Then I fertilized it and seeded it with seed, usually furnished by Mr. Stanley. On the dam, which was really a separate contract of $10,000.00, I raised the existing pond dam about 10 feet, which enlarged the existing smaller pond to an area of about an acre and a half. We built farm roads through the pastures.

These activities are best summarized as putting in pasture and are purely agricultural.[1] In its opinion, the Court of Appeals

---

1. Under the facts of this case, we are not faced with and do not decide the applicability of the statute to a contract for the construction of a farm dam for an amount of $30,000 or more.

states: "The statute is equally applicable to the clearing and grading required for agricultural purposes as it is to the clearing and grading required for building purposes." 63 N.C. App. at 172, 310 S.E. 2d at 616. We do not agree and decline to hold that plaintiff's activities were intended by the legislature to be subjected to the licensing requirements of Chapter 87 of the General Statutes of North Carolina.

[3] Defendant Stanley argues there was no agency relationship between her and S.R.F. Management Corporation upon which to base her liability to plaintiff and points to the following portion of C.C. Walker's deposition testimony.

Q. . . . And what, specifically, did you ever discuss about S.R.F. Management having authority to act as agent for Helen C. Stanley in connection with the engagement of work to be done at Sitting Rock Farms?

A. I don't know nothing about no S.R.F. Management Corp.

Q. You've never heard of that before, or at the time you were making these contracts?

A. No, sir.

Q. And you, therefore, obviously have no information about S.R.F. Management Corp.?

A. No.

Q. A company you never heard of acting as agent of Helen C. Stanley do you?

A. No.

We note that throughout the fall of 1978 and spring of 1979, plaintiff dealt directly with *neither* defendant in this lawsuit in performing the services for which he seeks reimbursement. The constant and apparent source of authority was John Stanley or, at the latter's direction, Cox, the foreman. After Helen's purchase of the farm, there was no noticeable change in authority. John remained "in ultimate control." Creditors who were aware of the corporate shift from Sitting Rock Farms, Inc. to S.R.F. Management Corporation were led to believe "that nothing had really changed." Helen herself, as new owner of the property, made it

clear that "what he [John] says goes," expressing apparent approval and assent to the vast improvements taking place in the spring of 1979.

Where, as here, the defendant specifically denies the agency relationship and argues that plaintiff had no knowledge that the alleged agent existed, is the jury thereby precluded from considering the issue? The applicable law is clear and well settled:

> The rule is thus stated in Reinhardt on Agency, secs. 89a to 92, especially in section 91: "The doctrine of estoppel as applying to agency may, therefore, be summarized that where a party holds out another as his agent, or has knowingly allowed such person to act for him in one or more similar transactions without objection, he will, as a general rule, be estopped to deny the agency, whether it in fact existed or not, if a third party, without knowing the real state of the matter, and acting in good faith, and as a reasonable man would act from the appearance of things as created by the supposed principal, relies upon the existence of the agency and deals with the supposed agent as such, if the transaction be within the real or apparent scope of the authority exercised." But, "It is not necessary, however, that the principal's assent or sanction be given in advance of the performance of the transaction which constitutes the subject-matter or purpose of the agency. If his assent be obtained after the transaction by a confirmation of the assumed relation, it is equally binding and efficacious. Such a confirmation of the authority of the supposed agent is called a ratification." Reinhardt on Agency, sec. 96. This assent is equivalent to prior authority.

*Trollinger v. Fleer*, 157 N.C. 81, 87, 72 S.E. 795, 797 (1911). Where a principal accepts the benefits of unauthorized acts of his alleged agent, with knowledge that the agent was acting on his behalf, the principal thereby ratifies such acts and is bound thereby. *Trust Co. v. Gill, State Treasurer*, 286 N.C. 342, 211 S.E. 2d 327 (1975).

Pursuant to this analysis, we find that there is ample evidence from which a jury might conclude that after 1 January 1979 John Stanley acted as agent for defendant Helen Stanley. A careful and prudent person might perceive that John had the

authority to contract for the spring 1979 work on the farm or that Helen had ratified these acts. There was a direct conflict between the plaintiff and the defendant in their testimony on this question, and it is for the jury to pass upon the evidence and to find the truth of the matter.

The above rule applies equally when a corporation holds out or permits a person to hold himself out as its agent. *Moore v. W O O W, Inc.*, 253 N.C. 1, 116 S.E. 2d 186 (1960). *See also* 19 Am. Jur. 2d *Corporations* § 1164 (1965). Thus, a jury might find in this case that John Stanley, as president, acted to bind the S.R.F. Management Corporation in making and delivering the promissory note to plaintiff. The evidentiary facts of the lease agreement provision giving Helen, as lessor, responsibility for capital expenditures and the loan repayment agreement item wherein $60,000 was advanced to the trust for improvements to the farms are relevant to a jury determination of this issue.

The trial court erred in granting summary judgment for the defendant.

The decision of the Court of Appeals is reversed, and this case is remanded to that court for further remand to the Superior Court, Rockingham County, for proceedings not inconsistent with this opinion.

Reversed and remanded.