FLORENCE CONCRETE v. N.C. LICENSING BOARD FOR GENERAL CONTRACTORS

[341 N.C. 134 (1995)]

FLORENCE CONCRETE PRODUCTS, INC., A SOUTH CAROLINA CORPORATION, PETITIONER
v. NORTH CAROLINA LICENSING BOARD FOR GENERAL CONTRACTORS,
RESPONDENT

No. 70PA94

(Filed 28 July 1995)

### Contractors § 4 (NCI4th)— manufacture and installation of concrete bridge components—general contractor's license not required

Petitioner was not required to possess a general contractor's license when manufacturing and installing prestressed concrete components for DOT bridge construction projects since (1) petitioner's job does not constitute the construction of a building, structure or highway within the meaning of N.C.G.S. § 87-1 because petitioner manufactures and installs only bridge caps, beams and barrier rails, building the entire bridge takes from one week to ten days, petitioner's portion of the project amounts to approximately six to eight hours, and petitioner thus performs only a small portion of the bridge construction; (2) petitioner's work does not constitute an improvement to a highway within the meaning of § 87-1; and (3) the policy reasons behind the licensure requirement of § 87-1 do not apply because the DOT supervises and controls every step of the project in which petitioner is involved.

**Am Jur 2d, Building and Construction Contracts § 131.**

**Who is a "contractor" within statutes requiring the licensing of, or imposing a license tax upon, a "contractor" without specifying the kinds of contractors involved. 19 ALR3d 1407.**

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 113 N.C. App. 270, 437 S.E.2d 877 (1994), reversing judgment on judicial review for petitioner entered 2 January 1992 by Barnette, J., in Superior Court, Wake County. Heard in the Supreme Court 9 May 1995.

*Jordan, Price, Wall, Gray & Jones, by Henry W. Jones, Jr. and Jonathan P. Carr, for petitioner-appellant.*

*Bailey & Dixon, L.L.P., by Carson Carmichael, III, for respondent-appellee.*

ORR, Justice.

Petitioner Florence Concrete is a South Carolina corporation engaged in the manufacture and installation of prestressed concrete components for highway bridges. As such, petitioner has bid on past projects with the North Carolina Department of Transportation ("DOT"), supplied prestressed concrete components for more than two hundred North Carolina bridges, and installed these components in North Carolina bridges after bidding on these projects and being awarded the contracts.

In 1990, DOT issued invitations to petitioner to bid on fourteen DOT projects to supply and place prestressed concrete bridge components in North Carolina bridges. Upon receipt of petitioner's bids, the Department of Administration Division of Purchase and Contract ("DOA") raised questions regarding licensing requirements for petitioner and other companies supplying prestressed concrete beams for these bridges. In a letter dated 6 February 1991, the State Purchasing Officer for DOA requested an opinion from respondent, the North Carolina Licensing Board for General Contractors, regarding the licensing requirements for bidders under these types of contracts. In a letter dated 13 February 1991, the secretary for respondent informed DOA that the total contract price would be the determining factor for licensing requirements. At that time, the statutory minimum was $45,000. See N.C.G.S. § 87-1 (1989). Thus, the secretary informed DOA that "such persons, firms or corporations bidding upon or contracting for projects costing $45,000 or more are required to be licensed general contractors."

After receiving respondent's letter, DOT disqualified petitioner and its bids on the DOT projects. In order to continue to bid on bridge projects, petitioner obtained a general contractor's license; however, this action was taken "under protest" because of the increased liability and insurance costs involved with being a general contractor. Prior to this time, petitioner had not received notice from any North Carolina department or agency that a general contractor's license was required for bidding on or performing its bridge work.

On 9 April 1991, petitioner sought a declaratory ruling from respondent requesting a ruling that petitioner did not need a general contractor's license to bid on DOT projects because, under these facts, petitioner did not meet the definition of a general contractor under N.C.G.S. § 87-1 and the case law interpreting this section. Respondent failed to issue a ruling within sixty days, which, under

then-existing N.C.G.S. § 150B-17 (recodified as N.C.G.S. § 150B-4), was tantamount to a denial of the request on its merits.

Petitioner filed a verified petition for judicial review in Superior Court, Wake County. On 2 January 1992, Judge Barnette entered a judgment containing findings of fact which tend to show the following:

The bidding procedure regarding these contracts with DOT, which petitioner has followed in the past and is expected to follow in the future, begins when DOT issues invitations for bids. Petitioner then returns its bid to DOT, and DOT opens the bids and tabulates the results. Thereafter, DOT mails a notice of intent to award the contract to the lowest responsible bidder. DOA then issues purchase orders with regard to the contract. As found by the trial court,

In the past, all purchase orders issued by DOA have required, in one form or another, that:

Beams, caps, & rails to be delivered by truck, unloaded & put in place by supplier, . . .

Delivery will be made from Sumter, SC within 45 consecutive calendar days after receipt of order.

All necessary trucks, cranes, operators, labor & other equipment & material necessary for complete job to be furnished by Beam manufacturer.

The duties petitioner performs pursuant to these purchase orders have not changed in the past and are not expected to change in the future.

After petitioner receives a signed purchase order from DOA, it begins fabricating the concrete bridge components in its South Carolina plant. At this time, petitioner provides a DOT inspector with an office in its plant, and the inspector supervises the manufacture of the concrete components. When the bridge components are completed, the DOT inspector inspects the completed bridge components for project specifications and stamps the components indicating such approval before they are shipped out of petitioner's plant to the project in North Carolina.

After fabrication of the concrete components is completed and these components are inspected and approved, petitioner holds the components in its plant in South Carolina until the North Carolina

Division of Bridge Maintenance ("DOM"), a division of DOT, requests delivery to North Carolina. Before DOM requests delivery of these concrete components, DOM's maintenance crews excavate the site for the bridge pilings by removing any existing bridge. The DOM crews then drive the pilings into place. Thereafter, DOM notifies petitioner to proceed with delivery and installation of the bridge caps, bridge beams, and barrier rails, pursuant to the purchase order.

Petitioner then proceeds to the project site where it installs the bridge caps and the first span of bridge components, consisting of eight to twelve concrete slabs. DOM controls and supervises this process. After petitioner completes this step, DOM crews, under DOM supervision, backfill the approach of the first span. Thereafter, petitioner places mats, which are owned and supplied by the State, on the approach and first span and then moves its crane to begin span two, if necessary. After the span or spans are in place, petitioner installs its barrier rails. Once the barrier rails are installed, petitioner's work is completed, and petitioner removes its equipment from the project site. State crews then complete all backfilling, wing wall installation, and pavement preparation. The pavement is placed by either DOM crews or other subcontractors. The entire project takes from one week to ten days to complete, and petitioner's portion of the project amounts to approximately six to eight hours.

Based on these findings, the trial court concluded that petitioner "does not meet the definition of a general contractor set forth in G.S. § 87-1 and does not require a North Carolina general contractor's license to bid and perform the work on behalf of the North Carolina Department of Transportation" and reversed respondent's "decision." Respondent appealed to the Court of Appeals, and on 4 January 1994, the Court of Appeals reversed the trial court's decision. Pursuant to N.C.G.S. § 7A-31, petitioner filed a petition for discretionary review with this Court, which was allowed 7 April 1994.

The sole issue before us is whether, under the facts of this case, petitioner is a "general contractor" as defined by N.C.G.S. § 87-1 and is therefore required to obtain a general contractor's license to perform its contracts with DOT. For the reasons stated below, we conclude that petitioner is not a general contractor, and we therefore reverse the decision of the Court of Appeals.

N.C.G.S. § 87-1 states in pertinent part:

[A]ny person or firm or corporation who for a fixed price, commission, fee, or wage, undertakes to bid upon or to construct or

who undertakes to superintend or manage, on his own behalf or for any person, firm, or corporation that is not licensed as a general contractor pursuant to this Article, the construction of any building, highway, public utilities, grading or any improvement or structure where the cost of the undertaking· is thirty thousand dollars ($30,000) or more . . . shall be deemed to be a "general contractor" engaged in the business of general contracting in the State of North Carolina.

N.C.G.S. § 87-1 (1994). When an entity falls under this statutory definition, it must be licensed as a general contractor. *See Baker Construction Co. v. Phillips*, 333 N.C. 441, 426 S.E.2d 679 (1993).

Based on our holding in *Vogel v. Reed Supply Co.*, 277 N.C. 119, 177 S.E.2d 273 (1970), and the specific facts of the present case, we conclude that petitioner is not a general contractor as defined under N.C.G.S. § 87-1. In *Vogel*, the issue presented was whether a subcontractor, Reed Supply Company, was a general contractor as defined by N.C.G.S. § 87-1. Under the facts of *Vogel*, Reed Supply Company undertook "to furnish labor and materials in excess of $20,000.00[, the statutory minimum at that time,] to construct integral parts of a large building complex." *Id.* at 131-32, 177 S.E.2d at 281. Specifically, Reed Supply Company was required to

"furnish and erect exterior and interior wall panels, wood floor system subfloor, roof sheathing, bridging, trusses. Furnish and install windows, doors, base, shoe, soffit trim, plywood closures, masonite siding and louvers. Furnish only roofing and felt. Furnish and install shelving, door locks, door knockers. Furnish and complete painting. Furnish only entrance door frame."

*Id.* at 132, 177 S.E.2d at 281. "A few minor items, including painting of the interior ceilings, were specifically excluded from the subcontract." *Id.*

In determining whether Reed Supply Company qualified as a general contractor under N.C.G.S. § 87-1, we reviewed the language of the statute as follows:

It is apparent, and we think significant, that Reed did not undertake to construct a *building* or *structure*. Completion of the above items leaves much to be done before a *building* or a *structure* results. . . . A *building* is defined as "an edifice . . . a structure"; and a *structure* is defined as "that which is built or constructed; an edifice or building of any kind." Black's Law

Dictionary, 4th Ed. Rev. 1968; *Brown v. Sikes,* 188 S.C. 288, 198 S.E. 854 (1938). So when the words *building* and *structure* are strictly construed, in context with the remainder of G.S. 87-1, they do not embrace parts or segments of a building or structure.

*Id.*

Similarly under the facts in the present case, petitioner does not undertake to bid upon or construct "any building, highway, . . . or structure." Petitioner constructs and installs prestressed concrete components for highway bridges. Specifically, under its contracts with DOT, petitioner only undertakes to construct and install bridge caps, bridge beams, and barrier rails. Building the entire bridge takes from one week to ten days, and petitioner's portion of the project amounts to approximately six to eight hours. According to the facts as found by the trial court, either DOM crews or other subcontractors complete the rest of the bridge, which includes backfilling, wing wall installation, pavement preparation, and paving. Thus, installation of petitioner's prestressed components leaves much to be done before a bridge results. Under our holding in *Vogel,* therefore, petitioner's job of manufacturing and installing these prestressed concrete components does not constitute the construction of a "building," "structure," or "highway" under the statute.

In determining that petitioner qualified as a general contractor under N.C.G.S. § 87-1, however, the Court of Appeals stated,

> the work performed by Florence Concrete involved the manufacture of prestressed concrete components for highway bridges. This constitutes an *improvement* to a *highway* and is thus the type of work referred to in G.S. § 87-1. Furthermore, all Florence Concrete's contracted work appears to exceed the statutory $30,000 limit. Under these circumstances, we hold Florence Concrete is required to possess a general contractor's license when performing DOT bridge construction projects if the cost of the undertaking exceeds the statutory minimum.

*Florence Concrete v. N.C. Licensing Bd. for Gen. Contractors,* 113 N.C. App. 270, 274, 437 S.E.2d 877, 880 (1994).

Again, based on our holding in *Vogel* and the underlying policy reasons behind the licensure requirement, we disagree with the holding of the Court of Appeals. In *Vogel,* we stated that the purpose behind N.C.G.S. § 87-1 is to protect the public from incompetent

builders. *Vogel*, 277 N.C. at 130, 177 S.E.2d at 280. Further, we defined an "improvement" under the statute as follows:

> The term "improvement" does not have a definite and fixed meaning. *Cities Service Gas Co. v. Christian*, 340 P.2d 929 (Okl. 1959). . . . The word is sometimes used to refer to any enhancement in value, particularly in relation to non-structural changes to land. *Mazel v. Bain*, 272 Ala. 640, 133 So. 2d 44 (1961). But where, as here, it is used in context with the words *building* and *structure*, its meaning is otherwise. As used here it connotes the performance of construction work and presupposes the prior existence of some structure to be improved. . . . The construction in this case "started from scratch." There was no existing building or structure to be improved, and in our view the term "improvement" as used in G.S. 87-1 has no application to the facts in this case.

*Id.* at 132-33, 177 S.E.2d at 281-82. Based on the conclusion that Reed Supply Company did not construct a structure, building, or improvement under the statute and "examining the statute in light of its purpose," we held that Reed Supply Company was not a "general contractor" as defined by N.C.G.S. § 87-1 and was therefore not required to be licensed. *Id.* at 133, 177 S.E.2d at 282.

Similarly, in the present case, petitioner's contracts with DOT do not involve an improvement to a preexisting structure. Petitioner only contracts with DOT to build replacement bridges, and prior to petitioner installing its prestressed concrete components, DOM's maintenance crews remove any existing bridge. Thus, because the term "improvement" presupposes the existence of some structure to be improved, the fact that any previously existing bridge is removed before petitioner begins installation of its components leads us to conclude that, as in *Vogel*, this term does not apply in the present case. Further, because petitioner contracts with DOT to perform only a small portion of the highway bridge construction, which does not include the backfilling, wing wall installation, and especially the paving, we disagree with the Court of Appeals' classification of petitioner's work as an improvement to a "highway."

Additionally, the policy reasons behind the licensure requirement of N.C.G.S. § 87-1 do not apply to require licensure of petitioner under the facts in the present case. DOT supervises and controls every step of the project in which petitioner is involved. In fact, a DOT inspector

STATE v. QUICK

[341 N.C. 141 (1995)]

even inspects the manufacture of the prestressed concrete compo-nents in petitioner's plant and approves them for use in North Carolina bridges. Once on the construction site, DOM supervises and controls petitioner's installation of bridge caps and components.

N.C.G.S. § 87-1 requires licensure of general contractors in order to protect the public from incompetent builders. Where, as here, the public is protected by a State agency which has been delegated the authority to supervise the construction and maintenance of highways and highway bridges, the protection of the public does not require licensure of a subcontractor like petitioner who contracts to perform a small portion of the replacement bridge construction and whose work is closely supervised by the State agency. Thus, we hold that under the specific facts of this case, petitioner is not a general con-tractor as defined under N.C.G.S. § 87-1 and therefore is not required to be licensed as such. We note, however, that our holding here today does not necessarily extend to the private sector where a State agency is not required to oversee construction and where the safety of the public would be at issue.

For the foregoing reasons, we reverse the decision of the Court of Appeals.

REVERSED.