IN THE SUPREME COURT OF NORTH CAROLINA

No. 71A22

Filed 1 September 2023

STATE OF NORTH CAROLINA

v.

DAVID MCKOY

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 281 N.C. App. 602 (2022), affirming a judgment entered on 22 March 2019 by Judge John M. Dunlow in Superior Court, Durham County. Heard in the Supreme Court on 26 April 2023.

*Joshua H. Stein, Attorney General, by M. Lynne Weaver, Special Deputy Attorney General, and Ryan Y. Park, Solicitor General, for the State-appellee.*

*James R. Glover for defendant-appellant.*

ALLEN, Justice.

A divided panel of the Court of Appeals upheld defendant's voluntary manslaughter conviction despite defendant's claim that the trial court erred by refusing to allow the jury to consider photographs and text messages found on the victim's cellular phone. We conclude that the trial court did not abuse its discretion and that admitting the photographs and text messages into evidence almost certainly would not have changed the outcome of defendant's trial. Accordingly, we affirm the decision of the Court of Appeals.

## I.    Background

On 17 January 2017, a grand jury in Durham County returned an indictment charging defendant with the murder of eighteen-year-old Augustus Cornelius Brandon. The case was tried in Superior Court, Durham County, in March 2019. Defendant maintained throughout trial that he shot Brandon in self-defense.

The evidence presented to the jury tended to show the following. Defendant and Brandon had known each other for years. While they were never friends, they had several mutual acquaintances. Defendant believed that Brandon and some of his friends were known "to rob people" and "gang bang and to tote guns." Defendant described a handful of interactions with Brandon that took place not long before Brandon's death. On one occasion, Brandon told a mutual acquaintance in defendant's presence that he would "smack" defendant. On another, Brandon "randomly showed [defendant] a video of [Brandon] shooting a gun." This last incident left defendant feeling "confused and uncomfortable," and he "tried to avoid" Brandon thereafter. Defendant also alleged that one of Brandon's friends "robbed [defendant's friend] at gunpoint for [a] fake [gold] chain."

Defendant decided to purchase a semi-automatic rifle for his own protection. He usually kept the rifle in the trunk or the back seat of his Honda Accord because his mother did not want any firearms in her home.

On the morning of 9 December 2016, defendant was leaving his neighborhood when Brandon drove by him in a gray car. As he passed defendant's vehicle, Brandon turned his head and appeared to notice defendant. Defendant exited his neighborhood

with Brandon travelling ahead of him. Brandon then pulled off the road and allowed defendant to pass him before reentering the road behind defendant. Defendant turned onto a side road in an unsuccessful attempt to evade Brandon. Brandon passed defendant and brought his car to an abrupt stop, forcing defendant to stop as well.

Brandon stepped out of his vehicle and began walking toward defendant. Defendant put his car in reverse gear and saw Brandon run to the rear of Brandon's vehicle and open the trunk. Although he did not see Brandon holding a gun, defendant thought that Brandon had retrieved a firearm. Ducking below the steering wheel, defendant pressed the accelerator, accidentally backing his car into a ditch. Defendant testified that he "thought [Brandon] was going to shoot [him] while [he] was stuck in the ditch."

Brandon returned to his vehicle and drove it closer to defendant's car before again exiting and approaching the passenger's side of defendant's automobile. Defendant retrieved his rifle from the back seat and shot at Brandon through the passenger window. Brandon ran toward the rear of his own car, and defendant got out of his vehicle and crouched behind it "for cover."

The jury heard apparently inconsistent versions of what happened next. According to the testimony of Detective Christin Reimann of the Durham County Sheriff's Office, defendant told her on the day of the shooting that Brandon started running away, at which point defendant fired two more shots and watched Brandon fall. In a subsequent interview with Detective Reimann and again at trial, defendant

said he thought that Brandon was trying to reposition himself and flank defendant, not flee the scene. Two motorists who witnessed the final moments of the encounter between defendant and Brandon testified that Brandon was running away from defendant's position when defendant shot him.

After Brandon fell, defendant called 911. Law enforcement officers arrived at the scene, where they found Brandon dead and unarmed. Forensic examination revealed that Brandon had been shot in the back of the head and in the mid-area of the left side of his back. The shot to the back of the head killed Brandon.

The State's witnesses at trial included Brandon's parents, Angela and Darius Clark. Mrs. Clark testified that Brandon was her only son and that he lived in the family home with the couple and their two daughters. Although Mrs. Clark testified that the family did not keep guns at home—she cleaned Brandon's room and never saw one there—she also testified that one of Brandon's friends informed her three days before Brandon's death that Brandon had a firearm. When Mrs. Clark asked Brandon whether he had a gun, he teared up and confessed to having possessed a firearm, though he also claimed that someone had stolen it. Brandon told his mother that he needed a gun for protection and asked her for help in obtaining another one. Mrs. Clark knew that Brandon was frightened because he did not normally "tear up and cry like that." In her recollection, Brandon was "always a happy, smiling child." Mrs. Clark testified that she was unfamiliar with defendant prior to her son's death. In response to questions from defense counsel, Mrs. Clark admitted that she and Mr.

Clark went through the contents of Brandon's cell phone with Detective Reimann. Defense counsel did not ask Mrs. Clark any questions regarding those contents.

Before Mr. Clark took the stand, the State filed a motion in limine urging the trial court to prohibit defense counsel from "ask[ing] about contents of [Brandon's] phone that would potentially show specific acts of conduct of the victim in the past." The State maintained that such evidence was "not admissible unless the defendant had knowledge of it on the date of the alleged offense." The trial court reserved its ruling on the motion, and the State called Mr. Clark to the witness stand.

Like Mrs. Clark, Mr. Clark testified that he had never heard of defendant before Brandon's death. On the morning of 9 December 2016, according to Mr. Clark, Brandon seemed "really happy. He was always a happy guy, lot of fun." Mr. Clark stated that he did not allow guns in the house and that, to the best of his knowledge, Brandon did not have a gun with him or in his car on the morning of 9 December 2016.

Before cross-examining Mr. Clark, defense counsel requested that the jury be excused. Defense counsel notified the trial court that he planned to ask Mr. Clark about the contents of Brandon's cell phone, "which, according to discovery as tendered by the [S]tate, [Mr. Clark] went through with his wife, Ms. Clark, and [Detective Reimann]." Those contents, "according to the discovery," included photographs of Brandon and his friends holding guns and SMS text conversations "of a somewhat violent nature" between Brandon and other people. Noting that defendant was

claiming self-defense, the State argued that the photographs and text messages could not have influenced defendant's state of mind on 9 December 2016 because he did not find out about them until later. Defense counsel countered that the State opened the door to the cell phone evidence when Mr. Clark testified that Brandon was "always a happy guy."

The trial court allowed defense counsel to question Mr. Clark outside the jury's presence so that the court could better understand what information defense counsel wished to present. In response to defense counsel's questions, Mr. Clark denied having been shown any photographs or text messages on Brandon's phone during his meetings with Detective Reimann. In particular, he claimed not to recall seeing any photographs of Brandon holding guns or any text messages in which, as defense counsel put it, Brandon "was setting up times and places to meet up to fight other people."

The trial court ruled that defense counsel could ask Mr. Clark in front of the jury whether he met with Detective Reimann and viewed the contents of Brandon's phone. The court further ruled that "any question relative to the contents of that phone and text messages that may or may not have been contained on that phone [would not be] allowed."

At the conclusion of the evidence, and before the jury's deliberations, the trial court instructed the jury on the elements of first-degree murder, second-degree murder, and voluntary manslaughter. The court explained to the jury that "defendant

would not be guilty of any murder or manslaughter if [he] acted in self-defense, *and if [he] did not use excessive force under the circumstances*." (Emphasis added.) The court further explained that, even if the jury did not find defendant guilty of murder, the jury had a duty to convict defendant of voluntary manslaughter if it found beyond a reasonable doubt that defendant "intentionally wounded [Brandon] with a deadly weapon and thereby proximately caused [Brandon's] death, *and that [he] used excessive force*." (Emphasis added.)

On 22 March 2019, the jury found defendant guilty of voluntary manslaughter, and the trial court sentenced defendant to imprisonment for a term of sixty-four to eighty-nine months. Defendant appealed his conviction, arguing that the trial court committed reversible error by excluding the photographs and text messages on Brandon's cell phone.

On 1 February 2022, a divided panel of the Court of Appeals held that defendant received a fair trial free of prejudicial error. *State v. McKoy*, 281 N.C. App. 602 (2022). According to the majority, in deciding which questions defense counsel could or could not ask Mr. Clark regarding Brandon's cell phone, "the [trial] court engaged in the evidentiary balancing test prescribed by Rule 403 of the North Carolina Rules of Evidence." *Id.* at 607. Moreover, in the majority's view, even if the trial court erred in refusing to admit the cell phone evidence, the error "was not sufficiently prejudicial to warrant a new trial." *Id.* at 608. The majority saw no reasonable possibility that the cell phone evidence would have changed the outcome

of defendant's trial because (1) "the trial court admitted substantial evidence supporting [d]efendant's theory of self-defense" and (2) "the evidence tended to show that [d]efendant was honestly in fear for his life, but that the degree of force he used was unreasonable, as . . . Brandon was unarmed and running away from [d]efendant when he was killed." *Id*.

The dissent would have held that the testimony of Brandon's parents opened the door to the cell phone evidence and that the trial court's refusal to admit the evidence entitled defendant to a new trial.

> Defendant was convicted of voluntary manslaughter for imperfect self-defense because the jury found his degree of force was unreasonable. The [cell phone] evidence goes towards [d]efendant's state of mind and reasonableness of fear during the incident. There is a reasonable possibility if this evidence and testimony had not been excluded . . . a different result may have been reached by the jury . . . .

*Id*. at 613–14 (Tyson, J., dissenting).

On 7 March 2022, defendant filed a notice of appeal with this Court based on the dissent. *See* N.C.G.S. § 7A-30(2) (2021) ("[A]n appeal lies of right to the Supreme Court from any decision of the Court of Appeals rendered in a case . . . [i]n which there is a dissent when the Court of Appeals is sitting in a panel of three judges.").

## II. Analysis

In his principal brief to this Court, defendant concedes that the evidence on Brandon's cell phone was inadmissible under the Rules of Evidence. He argues, however, that the State opened the door to the evidence "th[r]ough the testimony of

[Brandon's] parents." Specifically, defendant points to Mrs. Clark's testimony that Brandon was "always a happy, smiling child" who nonetheless admitted to Mrs. Clark that he had obtained a firearm for protection. Defendant also cites Mr. Clark's assertion that Brandon was "always a happy guy" who did not have a gun in the house or in his car on 9 December 2016, as well as Mr. Clark's denial of any knowledge that Brandon had ever possessed a gun. Defendant maintains that the trial court's exclusion of the cell phone evidence prejudiced his defense:

> If the jury had been allowed to hear that [Brandon] . . . was a person who had possession of guns on multiple occasions when under no threat of harm, it would have been reasonable for the jury to conclude that the State had failed to prove beyond a reasonable doubt that [defendant] used more force than reasonably necessary to repel . . . Brandon's lethal attack on him.[1]

Defendant asks this Court to reverse the Court of Appeals and remand this case to the trial court for a new trial.

The State denies opening the door at trial to the cell phone evidence. It argues that descriptions of Brandon as a generally happy person did not amount to a claim

---

[1] In his principal brief, defendant also seems to argue that the trial court's ruling implicates his constitutional right "to call witnesses and to elicit testimony that bolsters a theory of defense." Defendant did not make any constitutional arguments to the trial court regarding the cell phone evidence. To the extent that he attempts to raise constitutional claims for the first time on appeal, our case law bars him from doing so. *State v. Garcia*, 358 N.C. 382, 410 (2004) ("It is well settled that constitutional matters that are not 'raised and passed upon' at trial will not be reviewed for the first time on appeal." (citation omitted)), *cert. denied*, 543 U.S. 1156 (2005); *see also* N.C. R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion . . . .").

that Brandon was peaceful or law-abiding. The State further argues that the trial court acted within its sound discretion in limiting the questions that defense counsel could ask on cross-examination regarding the cell phone evidence. Lastly, the State contends that, even if the trial court excluded the cell phone evidence in error, defendant has not shown the prejudice necessary to support his demand for a new trial.

**A. Scope of Appellate Review**

When a case comes to us under N.C.G.S. § 7A-30(2) based solely on a dissent in the Court of Appeals, "the scope of review is 'limited to those questions on which there was division in the intermediate appellate court.' " *State v. Rankin*, 371 N.C. 885, 895 (2018) (quoting *C.C. Walker Grading & Hauling, Inc. v. S.R.F. Mgmt. Corp.*, 311 N.C. 170, 175 (1984)); *see also* N.C. R. App. P. 16(b) ("When the sole ground of the appeal of right is the existence of a dissent in the Court of Appeals, review by the Supreme Court is limited to a consideration of those issues that are (1) *specifically set out in the dissenting opinion as the basis for that dissent*, (2) stated in the notice of appeal, and (3) properly presented in the new briefs . . . filed in the Supreme Court." (emphasis added)).

In their briefs to this Court, the parties argue extensively over whether the State opened the door at trial to the disputed cell phone evidence; however, we perceive no division between the majority in the Court of Appeals and the dissenting judge on this point. The majority opinion does not take a position contrary to the

dissent's assertion that the State opened the door to the evidence in question; rather, it assumes that the door was opened. *McKoy*, 281 N.C. App. at 608. The disagreement between the majority and the dissent thus centers not on whether the State opened the door but on whether, if the door was opened, defendant had the right to ask Mr. Clark specific questions about the cell phone's contents in front of the jury. *See id.* at 607 ("[T]he ultimate question on appeal is whether the trial court abused its discretion by excluding the cell-phone evidence, not whether the State 'opened the door' to evidence of Mr. Brandon's allegedly violent character."). We therefore limit our review to that issue and look to our precedents for guidance on the authority of a trial court to exclude evidence to which a party has opened the door.

**B. Opening the Door**

"The basis for the rule commonly referred to as 'opening the door' is that when a [party] in a criminal case offers evidence which raises an inference favorable to his case, the [other party] has the right to explore, explain or rebut that evidence." *State v. Brown*, 310 N.C. 563, 571 (1984). Specifically, "the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Albert*, 303 N.C. 173, 177 (1981).

The opening-the-door rule originates in case law and predates the General Assembly's enactment of the North Carolina Rules of Evidence. *Compare* An Act to Simplify and Codify the Rules of Evidence, ch. 701, 1983 N.C. Sess. Laws 666–84,

*with State v. Small*, 301 N.C. 407, 434–36 (1980) (applying the opening-the-door rule), *superseded by statute*, An Act to Abolish the Distinction Between Accessories Before the Fact and Principals and to Make Accessories Before the Fact Punishable as Principal Felons, ch. 686, § 1, 1981 N.C. Sess. Laws 984, 984. *See generally* Kenneth S. Broun et al., *Brandis & Broun on North Carolina Evidence* § 2 (8th ed. 2018) ("Prior to enactment of the Rules [of Evidence], the North Carolina law of evidence embodied constitutional decisions, specific statutes, and common law as evolved by the courts.").

Reliance on the opening-the-door rule is no longer necessary in many instances because the Rules of Evidence expressly provide for the introduction of rebuttal or explanatory evidence in certain situations. *See, e.g., State v. Duke*, 360 N.C. 110, 121–22 (2005) (observing that Rule 404(a)(1) allowed the State to introduce evidence of a defendant's character for violence after the defendant introduced evidence of his character for peacefulness), *cert. denied*, 549 U.S. 855 (2006). Nonetheless, the rule is still sometimes invoked to permit the introduction of evidence that the Rules might otherwise exclude. *See, e.g., State v. Chandler*, 100 N.C. App. 706, 710–11 (1990) (concluding that a defendant's misleading testimony regarding his criminal record opened the door to admission of his conviction of misdemeanor marijuana possession notwithstanding the time restrictions in Rule 609(b)).

As our precedents illustrate, the opening-the-door rule is intended to reduce the likelihood that a party's introduction of misleading or confusing evidence will

impair the capacity of the jury to perform its fact-finding role. In *State v. Patterson*, for example, the defendant's stepdaughter testified for the prosecution at the defendant's murder trial. 284 N.C. 190, 195 (1973). On cross-examination, defense counsel elicited statements from the stepdaughter "that she disliked the defendant and harbored a feeling of ill will toward him." *Id*. The prosecutor asked the stepdaughter on redirect why she disliked the defendant, and she alleged that the defendant had raped her. *Id*. On appeal, the defendant argued that the trial court erred by admitting the stepdaughter's rape allegation. *Id*. While acknowledging the "general rule of evidence that in a prosecution for a particular crime the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense," this Court found no error. *Id*. at 195–96.

> Here, evidence was elicited from [the defendant's stepdaughter] on cross-examination calculated and intended to show bias and to discredit her testimony. This calls for application of the rule that where evidence of bias is elicited on cross-examination[,] the witness is entitled to explain, if he can, on redirect examination, the circumstances giving rise to bias *so that the witness may stand in a fair and just light before the jury*.

*Id*. at 196 (emphasis added)*; see also Small*, 301 N.C. at 436 ("Here on direct examination defendant testified in such a way as to leave the false impression that the state had refused to accept his offer to submit to a polygraph examination. It was proper for the state, therefore, on cross-examination to show that, in fact, defendant had been given a polygraph [and failed it]. . . . Defendant by first injecting the subject of the polygraph into the trial in a manner designed to mislead the jury invited the

very cross-examination of which he now complains.").

Although a party can open the door to otherwise irrelevant or inadmissible evidence, we have never held that the opposing party's right to introduce such evidence is absolute. The opening-the-door rule exists to prevent the jury from being led astray, and there may be circumstances in which the opposing party's evidence risks confusing or misleading the jury as much as the evidence that the opposing party wishes to refute or contextualize. Thus, even when the door has been opened to otherwise irrelevant or inadmissible evidence, the trial court as gatekeeper may still exclude it pursuant to Rule 403 of the Rules of Evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[2] N.C. R. Evid. 403. *See generally Queen City Coach Co. v. Lee*, 218 N.C. 320, 323 (1940) ("The competency, admissibility, and sufficiency of the evidence is a matter for the [trial] court to determine.").

A trial court's decision to admit or exclude evidence to which a party has opened the door is subject to review on appeal for abuse of discretion. *State v. Darden*, 323 N.C. 356, 359 (1988) ("[D]efendant 'opened the door' to cross-examination

---

[2] We have also held that a trial court must exclude rebuttal or explanatory evidence that lacks a proper foundation. *See State v. Wilkerson*, 363 N.C. 382, 409–10 (2009) ("Even though a defendant may open the door to otherwise inadmissible testimony, . . . '[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.' " (second alteration in original) (quoting N.C. R. Evid. 602)), *cert. denied*, 559 U.S. 1074 (2010).

designed to rebut his assertion. . . . We find no abuse of discretion in the cross-examination allowed. We likewise find no abuse of discretion in the refusal to prohibit the cross-examination on the ground that the probative value of the evidence produced thereby was outweighed by the danger of unfair prejudice."), *cert. denied*, 517 U.S. 1197 (1996). *See generally State v. Campbell*, 359 N.C. 644, 673 (2005) ("The decision whether to exclude evidence under Rule 403 . . . is within the discretion of the trial court and will not be overturned [on appeal] absent an abuse of discretion."), *cert. denied*, 547 U.S. 1073 (2006).

"A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Hayes*, 314 N.C. 460, 471 (1985) (citation omitted)*; see also In re K.N.L.P.*, 380 N.C. 756, 759 (2022) ("Under [the abuse of discretion] standard, we defer to the trial court's decision unless it is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." (quoting *In re A.K.O.*, 375 N.C. 698, 701 (2020))). Hence, in a case in which the door was opened to otherwise irrelevant or inadmissible evidence, the party appealing the trial court's decision to admit or exclude such evidence under Rule 403 faces a steep uphill climb.

**C. No Reversible Error**

The Court of Appeals' majority correctly rejected defendant's call for a new trial. In the first place, the trial court did not abuse its discretion by preventing defense counsel from using cross-examination to inform the jury that Brandon's cell

phone contained photographs of Brandon holding firearms and text messages implicating Brandon in acts of violence. The court took seriously defense counsel's contention that the State had opened the door to this evidence. It also recognized, however, that evidence of a victim's past violent acts can sometimes unduly influence a jury. *See State v. Bass*, 371 N.C. 535, 544 (2018) (explaining that Rule 405(b) does not allow a defendant claiming self-defense to use evidence of the victim's past violent acts to prove that the victim was the aggressor because "a generally peaceful person may experience a moment of violence, and a normally aggressive or violent person might refrain from violence on a specific occasion").

The trial court tried to strike a balance that was fair to both parties and protective of the jury. It did not allow defense counsel to ask Mr. Clark specific questions about the cell phone's contents, but it did permit defense counsel to ask Mr. Clark whether Detective Reimann had shared the contents of Brandon's cell phone with him. Especially when viewed alongside Mrs. Clark's testimony that Detective Reimann had done just that, this question invited the jury to doubt Mr. Clark's testimony that he did not know anything about Brandon possessing a firearm. We are not prepared to conclude based on the record before us that the trial court's ruling was "so arbitrary that it could not have been the result of a reasoned decision." *Hayes*, 314 N.C. at 471.

Furthermore, even if the trial court abused its discretion, a new trial is not warranted because the exclusion of the cell phone evidence did not prejudice

defendant. We have explained that

> evidentiary error does not necessitate a new trial unless
> the erroneous admission was prejudicial. The same rule
> applies to exclusion of evidence. Evidentiary error is
> prejudicial when there is a reasonable possibility that, had
> the error in question not been committed, a different result
> would have been reached at the trial out of which the
> appeal arises. Defendant bears the burden of showing
> prejudice.

*State v. Jacobs*, 363 N.C. 815, 825 (2010) (internal citations and quotation marks

omitted)*; see also State v. Brewer*, 325 N.C. 550, 565 (1989) ("Assuming *arguendo* that

defendant's proffered evidence was erroneously excluded, . . . [d]efendant has not

carried his burden of showing a 'reasonable possibility that, had the error in question

not been committed, a different result would have been reached at the trial.'" (quoting

N.C.G.S. § 15A-1443(a) (1988))), *cert. denied*, 495 U.S. 951 (1990).

The trial court instructed the jury that defendant was not guilty of murder if

he shot Brandon in self-defense. The court further explained that, even if defendant

acted in self-defense, the jury should convict him of voluntary manslaughter if it

found beyond a reasonable doubt that he used excessive force, which the court defined

as "more force than reasonably appeared to the defendant to be necessary at the time

of the killing." As the dissenting judge at the Court of Appeals acknowledged, once

the jury determined that defendant was not guilty of murder, the only remaining

question was whether defendant's use of force in self-defense was reasonable "under

the facts as [they] appeared to him at the time." *McKoy*, 281 N.C. App. at 613 (Tyson,

J., dissenting). By convicting defendant of voluntary manslaughter, the jury signaled

its belief that defendant acted in self-defense but that the force he employed was excessive. *See id.*, 281 N.C. App. at 608–09 (majority opinion) ("As Defendant concedes, the guilty verdict suggests 'that the jury concluded that [Defendant] had a reasonable fear that he was facing an imminent threat of death or great bodily injury from [Mr.] Brandon at the time of the shooting, but that the State had proven beyond a reasonable doubt that he used more force than necessary.' " (alterations in original)); *id.* at 613 (Tyson, J., dissenting) ("Defendant was convicted of voluntary manslaughter for imperfect self-defense because the jury found his degree of force was unreasonable.").

There is no reasonable possibility that the cell phone evidence would have persuaded the jury that defendant's use of force was appropriate under the circumstances. The record nowhere indicates that defendant saw or knew anything about the photographs and text messages on Brandon's phone in advance of his fatal encounter with Brandon on 9 December 2016. It follows that the photographs and messages could not have influenced defendant's actions on that date. *See id.* at 613 (Tyson, J., dissenting) ("Defendant's . . . belief at the time of the incident determines the degree of force necessary to use for self-defense.").

Defendant insists that the cell phone evidence might have persuaded the jury that Brandon had a firearm on 9 December 2016 and thus that defendant did not use excessive force. Defendant highlights the testimony of two eyewitnesses who observed the final moments of his fatal encounter with Brandon. According to defendant, both

eyewitnesses testified to hearing more gunshots than the three shots fired by him. When this testimony is considered together with the photographs on Brandon's cell phone of Brandon holding firearms, defendant asserts, the extra gunshots "can most reasonably be explained as being fired by [Brandon]."

We are unconvinced. The cell phone evidence demonstrated that Brandon and some of his friends had access to firearms before 9 December 2016, but the jury heard other evidence to the same effect. Defendant testified that Brandon showed him a video of Brandon shooting a gun; he likewise alleged that Brandon and his friends were known "to rob people" and "gang bang and to tote guns." One of Brandon's friends seemingly corroborated some of defendant's allegations by admitting on the witness stand to misdemeanor convictions for carrying a concealed weapon and breaking and entering. Brandon's own mother testified that Brandon confessed to having possessed a firearm, though he claimed that someone had stolen it.

Moreover, on closer inspection, the eyewitness testimony offers little support for the theory that Brandon shot at defendant. Although one of the two eyewitnesses recalled hearing as many as seven shots, the other testified to hearing "between three and four" shots, an estimate consistent with the State's contention that Brandon was unarmed on 9 December 2016. The second eyewitness's recollection also accords with the testimony of a third person at the scene who remembered hearing "at least three shots." Notably, no eyewitness reported observing Brandon with a gun.

Of course, the biggest hole in defendant's theory is the uncontested fact that

defendant's rifle was the only weapon found at the crime scene. Given this evidentiary lacuna, no reasonable possibility exists that the cell phone evidence would have persuaded the jury that Brandon fired at defendant and defendant was therefore justified in killing him.

Finally, the cell phone evidence would not have helped defendant rebut substantial evidence showing that Brandon was attempting to flee when defendant fired his last two shots. The two eyewitnesses who had a clear view of Brandon testified that defendant fired at Brandon as he was running away. Brandon was wounded in the back of the head and in the back, which indicates that he was not facing defendant when defendant shot him. This eyewitness testimony, combined with the location of Brandon's injuries, undoubtedly contributed to the jury's apparent belief that defendant used excessive force under the circumstances as they appeared to him on 9 December 2016. We do not think the photographs and text messages on Brandon's cell phone would have blunted the impact of this evidence.

## III. Conclusion

The trial court's refusal to permit defense counsel to ask the victim's father or other witnesses about the photographs and text messages on the victim's phone did not constitute an abuse of discretion. There is no reasonable possibility that a ruling in defendant's favor on that matter would have led to a different jury verdict. We therefore affirm the decision of the Court of Appeals upholding defendant's voluntary manslaughter conviction.

AFFIRMED.